622 A.2d 333

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Roy STOCKER, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 17, 1992.

Filed March 11, 1993.

190

James C. Dalton, Doylestown, for appellant.

Mary Benefield Seiverling, Deputy Atty. Gen., Harrisburg, for Com., appellee.

Before McEWEN, DEL SOLE and HUDOCK, JJ.

HUDOCK, Judge:

This is an appeal from the judgment of sentence imposed on Appellant following his conviction of two counts of corrupt organizations,[1] and conspiracy to commit corrupt organizations.[2] Appellant was sentenced to a term of ten (10) to twenty (20) years in prison on one of the corrupt organization convictions,[3] and ten (10) to twenty (20) years in prison on the conspiracy conviction, to run consecutively. Post-trial motions were filed and denied and this appeal followed. We affirm.

The pertinent facts as summarized by the trial court are as follows:

In June, 1989, the Sixth Statewide Investigating Grand Jury issued presentment No. 17, in which it recommended the filing of charges of corrupt organizations and burglary against various defendants, including Roy Stocker. The presentment alleged that between 1981 and 1987 defendant Stocker and over a dozen other individuals conspired to conduct the affairs of an enterprise through a pattern of racketeering activity, engaging primarily in the manufacture and distribution of a controlled substance, methamphetamine.

Trial Court Opinion at p. 1–2.

Appellant raises seven (7) issues for our consideration in his appeal. They are:

1. Was the defendant denied a fair trial by the admission of references to the "death" and "murder" of Frank Russo, an alleged co-conspirator of defendant?

2. Did the court err in failing to grant the defendant's pretrial motion to quash paragraphs 19 through 24 of counts I and II of the criminal information?

3. Did the court err in failing to grant the defendant's motion for severance from the cases of defendants Schwartz, Kallaur and Saltzburg?

1. 18 Pa.C.S. § 911(b)(2).
2. 18 Pa.C.S. § 911(b)(4).
3. No sentence was imposed on the second corrupt organizations conviction.

4. Did the court commit reversible error when it refused to instruct the jury to make a finding of guilt or acquittal as to each predicate act alleged?

5. Was the defendant denied a fair trial by the court's admission of various statements made by certain co-conspirators which pertained to the defendant but were not made in his presence?

6. Is defendant entitled to dismissal and/or a new trial based upon after-discovered evidence regarding the testimony of Charles Hitchens, a Commonwealth witness?

7. Whether the court's imposition of a consecutive sentence of 10 to 20 years incarceration upon count III, conspiracy to commit corrupt organizations is illegal and improper, in that count III merged with count I for sentencing purposes, where the two counts alleged the same criminal acts and conduct?

Appellant's Brief at p. 3. We will address each issue in the order presented by Appellant.

First, Appellant claims he was denied a fair trial because certain statements were made in the presence of the jury which Appellant contends prejudiced him. The first statement Appellant complains of is as follows:

[Commonwealth's Attorney]: How long—for how long a period of time did you obtain methamphetamine from Mr. Russo?

[Witness Linda Orlando]: For about a year, up until he was murdered.

N.T. 6/18/90 at p. 44. Appellant claims that the jury could infer from this statement that Appellant was somehow responsible for the death of Frank Russo, even though Appellant was not charged with the predicate offense of murder. Appellant claims that this statement refers to other criminal activity which is inadmissible. While we agree that evidence of prior criminal activity is generally inadmissible to show defendant was likely to have committed the current offense, *Commonwealth v. Bonace*, 391 Pa.Super. 602, 571 A.2d 1079 (1990), *alloc. den.*, 526 Pa. 647, 585 A.2d 466, mere passing references to prior criminal activity do not necessarily result in a mistrial.

"Whether to declare a mistrial is a decision which rests within the sound discretion of the trial court, whose exercise thereof will not be reversed absent an abuse of such discretion." *Id.* 391 Pa.Super. at 608, 571 A.2d at 1082. "The nature of the reference and whether the remark was intentionally elicited by the Commonwealth are additional factors to be considered in determining whether a mistrial is necessary." *Id.* We note that the trial court recognized an objection by stating: "Objection noted. Until his death. Go ahead." N.T. 6/18/90 at p. 44. We hold that the trial court did not abuse its discretion when it admitted the testimony as corrected because this was a mere passing reference and was not expanded upon by the Commonwealth.

Next, Appellant asserts that the following statement prejudiced him:

[Appellant's Counsel]: Have you been charged with anything by the Federal Government?

[Witness Stephen Fenton]: No.

Q: Have you been interviewed by any of their agents?

A: I was first interviewed right after Frank's murder. N.T. 6/15/90 at p. 982. Appellant concedes, "[a]lthough various counsel objected and moved for a mistrial, the trial court denied the motions and cautioned the jury to disregard the reference to murder. N.T. 6/15/90, p. 983." Appellant's Brief at 13. We note that this line of questioning was pursued by Appellant's own counsel. We also note that the trial court sustained defense objections stating: "The objection is sustained because it's not really responsive to the question. Motions for mistrial are denied. And the answer is stricken." N.T. 6/15/90 at pp. 982–983. We find that this statement was not elicited by the Commonwealth and the court struck the answer from the jury's consideration. Therefore, the trial court did not abuse its discretion in admitting this testimony. Appellant's claim as to his first issue is without merit.

Next, Appellant claims the trial court erred in failing to quash paragraphs 19 through 24 of Count I of the criminal information. Appellant claims that those paragraphs pertain to the events involving the burglary and theft of approximate-

ly fourteen (14) gallons of P2P. Appellant claims that the original charges against him included the substantive offense of burglary. That charge was dismissed at the preliminary hearing, and Appellant sought to delete those paragraphs from the criminal information. Paragraphs 19 through 24 read as follows:

19. On or about September 29, 1986, as a co-conspirator with Frank RUSSO, possessed with intent to manufacturer [sic] methamphetamine, five (5) gallons of phenylacetone, also known as P2P or phenyl–2–propanone in violation of § 13 of the Act of April 14, 1972, (P.L. 233, No. 64).

20. On or about September 29, 1986, as a co-conspirator with Frank RUSSO, unlawfully take or exercise control over five (5) gallons of phenylacetone, also known as P2P or phenyl–2–propanone, the property of George WETTON, in violation of 18 Pa.C.S. § 3921.

21. On or about September 29, 1986, conspire with Frank RUSSO that they or one or more of them will commit racketeering acts 19 and 20 and did an overt act in pursuance thereof, to wit: Frank RUSSO obtained possession of five (5) gallons of phenylacetone, also known as P2P or phenyl–2–propanone, the property of George WETTON, in violation of 18 Pa.C.S. § 903.

22. On or about September 29, 1986, as a co-conspirator with Kenneth SCHWARTZ and/or Robert KALLAUR and/or Barry SALTZBURG and/or others, possessed between ten (10) and fourteen (14) gallons of phenylacetone, also know as P2P or phenyl–2–propanone, with the intent to manufacture methamphetamine and/or to deliver phenylacetone, in violation of § 13 of the Act of April 14, 1972, (P.L. 233, No. 64).

23. On or about September 29, 1986, as a co-conspirator with Kenneth SCHWARTZ and/or Robert KALLAUR and/or Barry SALTZBURG and/or others, unlawfully take or exercise control over fourteen (14) gallons of phenylacetone, also known as P2P or phenyl–2–propanone, the property of George WETTON, in violation of 18 Pa.C.S. § 3921.

24. On or about September 29, 1986, conspire with Kenneth SCHWARTZ and/or Robert KALLAUR and/or Barry SALTZBURG and/or others to commit racketeering acts 22 and 23 and did an overt act in pursuance thereof, to wit: Frank RUSSO obtained possession of between ten (10) and fourteen (14) gallons of phenylacetone, also known as P2P or phenyl–2–propanone, in violation of 18 Pa.C.S. § 903.

Criminal Information at pp. 4–5. Appellant claims that because the substantive charge was dismissed, so too should the paragraphs which relate to those events. We disagree.

We agree with the trial court's analysis of this issue and therefore adopt that portion of its opinion as follows:

The bill of information filed against Roy Stocker, included, at paragraphs 19 through 24, the offense of burglary as a predicate offense for the charge of corrupt organizations. Defense counsel filed a motion to quash these subparagraphs of the information, based upon the lack of evidence linking defendant Stocker to these crimes and the resulting dismissal of the charges at the preliminary hearing. This Court denied defendant's motion to quash and permitted the introduction of testimony regarding the burglary against defendant Stocker as it related to the predicate act alleged in his information.

Defense counsel alleges that this ruling was an abuse of discretion and deprived the defendant of a fair trial. Further, defense counsel submits that where the Commonwealth charges a particular predicate act as a substantive offense, and where that charge is dismissed at a preliminary hearing, that the Trial Court must consider this dismissal as dispositive on the issue of whether the predicate act may be included under the corrupt organizations charge. Defense counsel provides, however, no case law in support of this conclusion.

The Pennsylvania Corrupt Organizations Act, 18 Pa.C.S. § 911, does not require that a defendant be convicted of the predicate crimes which constitute a pattern of racketeering activity. *Commonwealth v. Taraschi*, 327 Pa.Super. 179, 475 A.2d 744, 749 (1984). The act requires

only that the Commonwealth prove the elements of two or more predicate acts beyond a reasonable doubt. Accordingly, the Commonwealth may at its discretion elect to charge a defendant solely with corrupt organizations, specifying the predicate acts which it will attempt to prove. Under such circumstances, there is no assurance that each and every predicate act alleged will be proved beyond a reasonable doubt, and there is no requirement that such be the case. Rather, the Commonwealth must prove only a course of conduct consisting of at least two of the predicate acts which the Commonwealth alleged. As was previously stated, this must be accomplished by proving each element of at least two of the predicate acts beyond a reasonable doubt.

■ Defense counsel argues that the courts should carve out a limited exception, whereby the fact-finder should be precluded from considering a particular predicate act solely because a district justice decides at a preliminary hearing that the evidence presented at that time is insufficient to support a substantive charge with respect to that offense. The Court can find no basis in law or policy to support such a conclusion. The predicate acts complained of in this instance comply with the requirements of Pa.R.Cr.P. Rule 225(b)(5) in that they are cognate to the offense alleged, and notice of the burglary-related acts was provided to the defendant. Further, the defendant was not charged separately with the burglary or theft charges and was not convicted of having committed them as separate offenses for which he may be sentenced.

Trial Court Opinion at 13–15. We note, additionally, that the substantive charge of burglary is different than the predicate offenses of theft alleged in the information. The crime of burglary as defined by 18 Pa.C.S. § 3502(a) is:

A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter.

The crime of theft by unlawful taking is defined in 18 Pa.C.S. § 3921(a) as:

A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

Therefore, while the charge of burglary was dismissed, it is not necessarily the case that the predicate offenses of theft by unlawful taking (as described in paragraphs 20 and 23 of the criminal information) must be eliminated because the proof required is of a different nature. We therefore agree with the trial court and find no abuse of discretion in refusing to quash paragraphs 19 through 24 of the criminal information.

Appellant's third issue concerns the denial of his pre-trial motion for severance from co-defendants Schwartz, Kallaur and Saltzburg. Essentially, Appellant claims that these defendants were the participants in the burglary alleged as part of paragraphs 19 through 24 above. We note that "the decision of whether to sever trials of co-defendants is one within the sound discretion of the trial judge and will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Patterson*, 519 Pa. 190, 197, 546 A.2d 596, 599 (1988). As with the previous issue, we agree with the trial court's analysis of this issue and adopt that portion of the trial court opinion as follows:

Prior to trial, defendant Stocker, through his counsel, filed a motion to sever his case from those of defendants Schwartz, Kallaur and Saltzburg. The basis for this motion was that the latter defendants "would be shown to have a direct involvement in the burglary of 9732 Clark Street, and the resulting theft of P2P belonging to George Wetton from that property." (Defendant's Brief). Only defendants Schwartz and Kallaur, however, were charged with the substantive offense of burglary and conspiracy to commit burglary. Defendant Saltzburg was charged only with corrupt organizations. Defense counsel also argues that the Commonwealth's failure to establish a prima facia case on the substantive burglary offense is "indicative of the remote connection established between defendant Stocker and the

burglary conspirators," and that "in light of this weak connection, the prejudicial impact of the burglary evidence and references to the ultimate murder of Frank Russo were overwhelmingly prejudicial to (defendant) Stocker."

Criminal defendants may be joined if they are alleged to have participated in the same act or transaction, or the same series of acts or transactions. Pa.R.Cr.P. Rule 1127A(2). A court, at its discretion may, however, order separate trials of defendants, if it appears that any party may be prejudiced by the defendants being tried together. Pa.R.Cr.P. Rule 1128. In determining whether to sever certain defendants, the court must balance the need to minimize the prejudice that may be caused by consolidation, against the general policy of encouraging judicial economy. See *Commonwealth v. Patterson*, 519 Pa. 190, 546 A.2d 596 (1988). Generally, a defendant's case should be severed if not doing so would result in substantial injustice. *Commonwealth v. Katsafanas*, 318 Pa.Super. 143, 464 A.2d 1270 (1983). As the *Katsafanas* Court noted, a better chance of acquittal from a separate trial does not meet this burden. Rather, the defenses presented by the various defendants must be "irreconcilable and exclusive" and "conflict at the core" before the substantial prejudice burden is met. *Commonwealth v. Bennie*, 352 Pa.Super. [558], 508 A.2d 1211 (1986).

Evidence was presented at trial linking defendant Stocker to the burglary of 9732 Clark Street and to defendants Schwartz, Kallaur and Saltzburg. Each defendant was alleged to have participated in some manner in the Clark Street burglary, and defendants Kallaur and Saltzburg were alleged to have been part of a corrupt organization controlled by Roy Stocker. Evidence was received to establish burglary as a predicate offense to the charge of corrupt organizations against defendants Kallaur and Saltzburg, and to establish burglary and conspiracy to commit burglary against defendants Schwartz and Kallaur. It is clear that the defendants are alleged to have participated in the same act or transaction, or the same series of acts or

transactions as required for joinder pursuant to Pa.R.Cr.P. Rule 1127A(2).

It is also clear that severing defendants Schwartz, Kallaur and Saltzburg would not have eliminated all burglary-related testimony against defendant Stocker. This lessens any prejudicial effect with respect to the defendant. Further, and more importantly, the Court's frequent and repeated instructions to the jury, as well as the Commonwealth's well-ordered presentation of the case allowed the jury to compartmentalize the evidence as it related to the separate defendants.

A review of the charge to the jury indicates that we carefully reiterated the importance of separating the evidence as to each defendant. In particular, we stated as follows:

These are separate cases. They are being tried together because it makes efficient sense to try them together, but they are separate cases. Some of the evidence with respect to some of the defendants may only be applied to that particular defendant or set of defendants and we've been through that before. When you deliberate you will be making determinations, guilty or not guilty, with respect to separate persons, separately considered.

Each of the defendants is entitled to that separate consideration. (N.T. Vol. XVII–117).

The substantial injustice standard necessary to mandate severance has not been met.

Trial Court Opinion at 15–18. Consequently, we find that the trial court did not abuse its discretion and that Appellant's claim with regard to this issue is without merit.

Appellant's fourth issue involves a challenge to the jury instruction given with regard to the predicate offenses charged. Appellant contends that it was error for the trial court to fail to instruct that the jury must find the defendant guilty or not guilty as to each predicate act alleged. Appellant argues that because he was not charged with substantive offenses, and the jury returned a general verdict, that this Court should review the record as a whole to determine

whether there was sufficient evidence to prove *each* predicate act. Specifically, Appellant claims there was insufficient evidence as a matter of law to establish the predicate acts contained in paragraphs 19 through 24 of the information and, therefore, the jury could have relied on those acts in its guilty verdict under the corrupt organizations charge. Both parties, as well as the trial court, recognize that this issue is one of first impression in Pennsylvania.

■ Initially, we note that the challenged predicate acts in paragraphs 19 through 24 of the information were worded in such a way as to cause Appellant to be liable, not necessarily as the one who committed the acts themselves, but rather as a co-conspirator. Therefore, we note the basic principle of conspirator liability, that once there is evidence of the presence of a conspiracy, the conspirators are liable for the acts of co-conspirators committed in furtherance of the conspiracy. *See Commonwealth v. Thomas,* 410 Pa. 160, 189 A.2d 255 (1963).

■ Furthermore, we note that Appellant's challenge to paragraphs 19 through 24 is related to his previous challenge concerning the dismissal at the preliminary hearing of the substantive charge of burglary. As we have stated, the predicate acts in paragraphs 19 through 24 concern the elements of theft by deception, not burglary, and the trial court properly allowed these paragraphs to remain in the criminal information. Therefore, his argument must fail that there was necessarily insufficient evidence to support those predicate acts merely because the substantive charge of burglary was dismissed at the preliminary hearing stage of the proceedings. Proof at trial is not the same thing as proof at the preliminary hearing. Moreover, Appellant has failed to state in what way the evidence presented at trial is insufficient. 18 Pa.C.S. § 911 does not require that Appellant be convicted of the predicate crimes which constitute a pattern of racketeering. *Commonwealth v. Taraschi,* 327 Pa.Super. 179, 475 A.2d 744 (1984).

We acknowledge that the trial court instructed the jury that the Commonwealth must prove beyond a reasonable doubt all the elements of at least two predicate acts. The trial court rejected a request for an instruction which would require the jury to specify which predicate acts it relied upon in returning its verdict. Although this issue has not been previously decided concerning the Pennsylvania corrupt organizations law, we agree with the analysis of the trial court concerning the use of criminal conspiracy law as the basis for denying Appellant's request for specificity on the part of the jury, and therefore adopt the following portions of the trial court's opinion:

Obviously our law requires that the reviewing court be satisfied that evidence exists which would lead a rational jury, following an appropriate jury instruction to find that each element essential for a corrupt organizations conviction has been established beyond a reasonable doubt. This would include a finding that all of the elements of at least two predicate acts alleged were proved beyond a reasonable doubt. It would not require, however, a finding of sufficient evidence for each and every predicate act alleged.

▆▆▆▆ We find support for our conclusion in Pennsylvania criminal conspiracy case law. It is well settled that an overt act in furtherance of a conspiracy is a necessary element of criminal conspiracy. *Commonwealth v. Finn*, 344 Pa.Super. 571, 496 A.2d 1254 [1985]; *Commonwealth v. Craft*, 304 Pa.Super. 494, 450 A.2d 1021 (1982); *In interest of Gonzales*, 255 Pa.Super. 217, 386 A.2d 586 (1978); *Commonwealth v. Holguin*, 254 Pa.Super. 295, 385 A.2d 1346 (1978). There is no requirement in Pennsylvania, however, that in situations where more than one overt act is alleged that the jury specify which of those acts is relied on in reaching a guilty verdict. If the reasoning behind this rule is extended to the context of corrupt organizations, it requires finding at least two predicate acts beyond a reasonable doubt, but does not require a specific finding as to each predicate act alleged.

An example of the above analysis in the context of criminal conspiracy is set forth in *Commonwealth v. Ackerman,* 239 Pa.Super. 187, 361 A.2d 746 (1976). In *Ackerman,* the defendant was indicted for criminal conspiracy. The overt acts alleged in the conspiracy indictment were kidnapping and aggravated assault. The evidence presented at trial was sufficient to prove only the overt act of aggravated assault. Although the *Ackerman* court could not be completely certain that the jury based its guilty verdict on the aggravated assault overt act, the Court affirmed the conspiracy conviction, nonetheless.

 Although we have determined that Pennsylvania law does not require proof beyond a reasonable doubt as to each predicate act alleged, the second aspect of [this] final issue presented by the defendant still merits discussion. To reiterate, the defendant alleges that insufficient evidence was presented at trial to support an affirmative finding as to burglary-related predic[ate] acts nineteen through twenty-four. We disagree with the defendant as to the sufficiency of the evidence.

\* \* \* \* \* \*

The uncontradicted testimony, especially that of co-conspirators Michael Kallaur and Steven Fenton, establishes a course of conduct during the summer of 1986 whereby Roy Stocker, Kenneth Schwartz, Frank Russo, Robert Kallaur, Michael Kallaur and Steven Fenton, agreed to burglarize from ten to fourteen gallons of P2P belonging to George Wetton from a private residence at 9732 Clark Street, Philadelphia. In particular, co-conspirator Steven Fenton testified that Roy Stocker was to share in any proceeds derived from the conspiracy. (N.T. Vol. XIII–911). These proceeds were to come from profits obtained after the P2P was converted to methamphetamine, and the methamphetamine was distributed to various third parties. (N.T. Vol. XIII–911). Testimony further establishes that on September 29, 1986, Michael Kallaur, John Kallaur and Frank Russo executed the burglary by entering the residence, and removing from ten to fourteen gallons of P2P from the

residence's garage to the trunk of Michael Kallaur's automobile. These facts, as testified to at trial, prove burglary-related predicate acts nineteen through twenty-four beyond a reasonable doubt.

Trial Court Opinion at pp. 35–36, 37–38. We therefore find that the trial court properly instructed the jury with regard to this issue and Appellant's claim is without merit.

Appellant's fifth issue concerns certain statements admitted into evidence which he contends were improper. We agree with the analysis of the trial court and therefore adopt the following portion of the trial court's opinion:

During the testimony of Philip Leonetti, he was asked, "What did Nick Scarfo tell you of the relationship of Roy Stocker and Philip Testa at that time?" A defense objection to this question was initially sustained, but the witness, Leonetti, was later allowed to answer. Leonetti testified, "My uncle (Nick Scarfo) asked Roy Stocker if he could work along with Reds Pontani up in the northeast, shaking people down, you know." (N.T. Vol. IV–336). With regard to this statement, the defendant specifically objects that the statement lacked a proper foundation to come within the co-conspirator exception to the hearsay rule. In support of this, the defendant argues that there was no evidence of a conspiracy between Philip Leonetti and Roy Stocker and/or Nicodemo Scarfo, and that there was no testimony of any particular overt act by the defendant in furtherance of such conspiracy.

We admitted the statement in question as a verbal event and not for the truth thereof. (N.T. Vol. IV–347). Such words are not hearsay, *Commonwealth v. Sampson*, 454 Pa. 215, 311 A.2d 624 (1973), and accordingly, no exception to the hearsay rule need be considered. In fact, words are often evidence of a conspiracy.

The defendant next objects to Philip Leonetti's testimony concerning the fact that Albert Pontani obtained a transcript through Roy Stocker which was ultimately provided to Nicodemo Scarfo. (N.T. Vol. IV–358). The defendant, again, argues that the statement does not fall within the co-

210

conspirator exception to the hearsay rule, due to an insufficient foundation. The defendant does not argue, however, that one must be indicted as a co-conspirator, in order to come within the exception.

The co-conspirator exception applies to hearsay statements made during the course of, and in furtherance of a conspiracy. *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981). The foundation required is proof, by a fair preponderance of the evidence, that a conspiracy existed, *Commonwealth v. Moyers*, 391 Pa.Super. 262, 570 A.2d 1323 (1990), as well as the additional requirement that the proffered statement contain certain "indicia of reliability" including personal knowledge of the assertions made in the statements, the absence of an apparent reason for the declarant to lie, spontaneity, and findings that the statement was against the declarant's penal interest. *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981).

With regard to the first prong of the test it is appropriate for the witness testifying to the out-of-court statements to establish the existence of the conspiracy. *Commonwealth v. Hirsch*, 225 Pa.Super. 494, 311 A.2d 679 (1973). There is no requirement, however, that the conspiracy be established before the statement is testified to by the defendant. The order of proof is within the discretion of the court. *Hirsch*, supra. A conspiracy for the purposes of the co-conspirator exception to the hearsay rule, may be inferentially established by showing the relation, conduct or circumstances of the parties. *Commonwealth v. Roux*, 465 Pa. 482, 350 A.2d 867 (1976).

In the case at bar, Philip Leonetti's testimony is based on his personal knowledge as the underboss of the Philadelphia La Cosa Nostra. As the underboss, Leonetti was privy to virtually every aspect of that crime family's activities, and his testimony establishes, by a fair preponderance of the evidence, that a conspiracy existed between himself, Albert Pontani, Nicodemo Scarfo and Roy Stocker. (N.T. Vol. IV-306-368). That the statement referred to above, was made in the course of and in furtherance of the

conspiracy, is self-evident. Therefore, the first prong of the co-conspirator exception has been met. Mr. Leonetti's personal knowledge of the assertions made in his statements, the absence of an apparent reason for him to lie, and the fact that the statement was against his penal interest, together establish the "indicia of reliability" necessary to meet the co-conspirator exception's final prong.

Next, defendant Stocker objects to Charles Hitchens' testimony to the effect that Frank Rosetti informed him that the only person who could "straighten out" the contract on Mr. Hitchens' life was Roy Stocker. (N.T. Vol. VII–140). As the Court instructed at the time this statement was made, these words are verbal assertions which are not offered for the truth thereof, but merely to form a basis for Mr. Hitchens meeting with Roy Stocker. Mr. Hitchens may have believed that the words were true but it matters not to the trial of this defendant. See *Commonwealth v. Sampson*, 454 Pa. 215, 311 A.2d 624 (1973), and *Commonwealth v. Darden*, 311 Pa.Super. 170, 457 A.2d 549 (1983). As the Commonwealth asserts in its brief, whether or not defendant Stocker was the only person who could help Mr. Hitchens avoid a contract on his life is of no moment in establishing any of the predicate acts charged. The fact merely explains the reason for Mr. Hitchens introduction to the defendant.

The defendant next objections to John Spadaccino's testimony that Roy Stocker told him that Anthony Gentile had taken a seven thousand dollar loan from a man known as Muncie. (N.T. Vol. VII–75). While the defendant concedes that the testimony was offered merely as a verbal event and not for its truth, the defendant submits that the relevance of this verbal act is outweighed by its substantial prejudice. The defendant, however, fails to assert the precise nature of the prejudice alleged, and after reviewing the transcript, the Court finds no substantial prejudice.

The defendant also objects to the testimony of Steven Fenton regarding the relationship which existed between Roy Stocker and Frank Russo. In particular, the defendant

212

objects to Steven Fenton's testimony that Frank Russo said, "Whatever he (Frank Russo) did he (Roy Stocker) got a piece of it," (N.T. Vol. XII–883, 885), and to Fenton's statement that Frank Russo told him, "Mr. Stocker was his boss, that's who he answered to." (N.T. Vol. XIII–967). The defendant asserts that these statements are hearsay and as such should have been excluded.

Again, we note, the co-conspirator exception applies to hearsay statements made during the course of, and in furtherance of a conspiracy. *Commonwealth v. Dreibelbis,* 493 Pa. 466, 426 A.2d 1111 (1981). The foundation required is proof, by a fair preponderance of the evidence, that a conspiracy existed, *Commonwealth v. Moyers,* 391 Pa.Super. 262, 570 A.2d 1323 (1990), as well as the additional requirement that the proffered statement contain certain "indicia of reliability" including personal knowledge of the assertions made in the statements, the absence of an apparent reason for the declarant to lie, spontaneity, and findings that the statement was against the declarant's penal interest. *Commonwealth v. Coccioletti,* 493 Pa. 103, 425 A.2d 387 (1981). A conspiracy for the purposes of the co-conspirator exception to the hearsay rule, may be inferentially established by showing the relation, conduct, or circumstances of the parties. *Commonwealth v. Roux,* 465 Pa. 482, 350 A.2d 867 (1976).

That there was a conspiracy between Roy Stocker and Frank Russo, at the time that the words objected to were uttered, is clear from the testimony. Not only Steven Fenton, but also John Spadaccino, Joseph Inadi, Charles Hitchens, Gerry Crouse and Frank Russo's brother, Anthony Russo, provided evidence as to the length and nature of the relationship. The testimony established by a fair preponderance of the evidence that Frank Russo became involved with Roy Stocker through his association with Big John's Chicken and Ribs Restaurant. Testimony also established that John Spadaccino was the conduit through which Frank Russo's relationship with Roy Stocker initially developed, and that following Frank Russo's association

with "Big John's" restaurant, Roy Stocker was entitled to a part of every illegal dollar that Frank Russo received, until Russo's death in 1987. Certainly, these facts establish the appropriate foundation by a fair preponderance of the evidence, and contain the necessary "indicia of reliability" to satisfy the co-conspirator exception to the hearsay rule.

Frank Russo's statements to Steven Fenton "furthered" the conspiracy, in that they informed one member of the conspiracy, Steven Fenton, of the conspiracy's scope, and thereby served to solidify the conspiracy's vertical structure. Whether or not this was Frank Russo's intent is immaterial. [S]ee *Commonwealth v. Dreibelbis*, 493 Pa. 466, 475, 426 A.2d 1111, 1115 (1981); *Commonwealth v. Coccioletti*, 493 Pa. 103, 111, 425 A.2d 387, 391 (1981); *Commonwealth v. Moyers*, 391 Pa.Super. 262, 570 A.2d 1323, 1326 (1990); *Commonwealth v. Robinson*, 298 Pa.Super. 447, 451, 444 A.2d 1260, 1262 (1982).

The defendant reiterates his hearsay argument, with respect to Anthony Russo's testimony concerning the fact that his brother, Frank Russo, had stated that Frank's illegal activities were supervised by Roy Stocker. (N.T. Vol. XIV–193). It is clear from the record that Anthony Russo's testimony is within the co-conspirator exception.

Trial Court Opinion at 21–27. We agree with the trial court that these statements were properly admitted into evidence and that Appellant's claims on this issue are without merit.

Appellant's sixth issue concerns both after-discovered evidence and the disclosure of exculpatory evidence. The trial court indicated that the motion concerning after-discovered evidence came in while it was preparing the trial court opinion. Consequently, the court did not address this issue at any length although it denied Appellant's motion for a new trial. Appellant claims that Charles Hitchens testified pursuant to a plea agreement in which he stated he participated in obtaining and distributing two drums, 50 gallons each, of P2P from "Reds" in Trenton. Appellant contends that on cross-examination, Hitchens stated that the facts in his plea agreement were essentially accurate. Appellant contends that after his

trial Hitchens testified in a federal prosecution on related charges, and in that federal case testified to having participated in only one deal involving one drum of P2P. Appellant asserts that Hitchens denied participating in a second deal.

After-discovered evidence is a basis for a new trial if it

(1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeaching credibility of a witness; and (4) is of such nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Buehl*, 510 Pa. 363, 393, 508 A.2d 1167, 1182 (1986) *citing Commonwealth v. Colson*, 507 Pa. 440, 469, 490 A.2d 811, 826 (1985). The decision to grant a new trial is within the discretion of the trial court and absent a clear abuse of that discretion we will not reverse the trial court's decision on appeal. *Commonwealth v. Nocero*, 399 Pa.Super. 346, 582 A.2d 376 (1990), *alloc. den.*, 527 Pa. 643, 593 A.2d 416 (1991). We note initially that the official record does not contain the notes of testimony to which Appellant refers as Hitchens' recanted testimony at the federal trial. Our review of this issue is not hampered, however, as a result of this defect.

Both Appellant and the Commonwealth concede that Hitchens' testimony at the federal trial took place after Appellant's state trial. Therefore, the first prong of the test enumerated in *Buehl, supra*, has been met. This testimony, however, does not survive either the third or fourth prongs. As the Commonwealth points out, the "deal" to procure either one or two 50–gallon drums of P2P was not alleged as a predicate offense in the criminal information filed against Appellant. Therefore, proof of the existence of the transactions would not cause a different verdict, as the act is not necessary to the proof of the crime of corrupt organizations as charged. Likewise, we find that to confront Hitchens with a changed version of his testimony serves only to impeach his

credibility, despite Appellant's argument to the contrary. Consequently, we find that the trial court did not abuse its discretion when it refused Appellant's motion for a new trial on this issue.

Because we find that Appellant was not entitled to a new trial on a theory of after-discovered evidence, we also find that Appellant was not entitled to disclosure of the statement made by Hitchens. Appellant contends that the joint state and federal prosecution teams were *aware* in 1989 that Hitchens' testimony, which formed the basis for his plea agreement, was not accurate. He claims that this evidence should have been turned over to the defense under Pa. R.Crim.P. 305(B)(1)(a). This rule reads as follows:

**B. Disclosure by the Commonwealth.**

(1) *Mandatory:* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

(a) Any evidence favorable to the accused which is material either to guilt or to punishment, and which is within the possession or control of the attorney for the Commonwealth.

Pa.R.Crim.P. 305(B)(1)(a) 42 Pa.C.S. We note that under this rule, as well as relevant case law, failure to disclose material and exculpatory evidence violates a defendant's due process rights. *Commonwealth v. Lochman,* 265 Pa.Super. 429, 402 A.2d 513 (1979); *see also Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The important words, however, are *material* and *exculpatory.* Appellant has failed to establish that this evidence is either material or exculpatory given the fact that the predicate acts listed in the criminal information do not concern these transactions. Likewise, Appellant has failed to demonstrate that there was anything for the Commonwealth to disclose. The fact that the Commonwealth

216

may have been aware of the inaccuracy of Hitchens' plea agreement testimony is not enough in itself. Appellant concedes that Hitchens did not actually testify differently until after the completion of Appellant's trial. Appellant does not point to any record which existed prior to his trial. Therefore, there was nothing for the Commonwealth to disclose, and he is not entitled to a new trial as a result of the absence of this information.

■ Lastly, Appellant claims that the trial court improperly sentenced him for conspiracy to commit corrupt organizations, and corrupt organizations as the underlying offense, imposing a consecutive sentencing scheme. He claims that this is an illegal sentence because the two convictions should have merged for sentencing purposes. It is a fundamental principle of law that the crimes of conspiracy and the completed underlying offense do not merge. *Commonwealth v. Fuller*, 396 Pa.Super. 605, 579 A.2d 879 (1990), *alloc. den.*, 527 Pa. 585, 588 A.2d 508 (1991). Therefore, the sentence was not illegal, and, therefore, Appellant's claim must fail. Appellant does not, however, claim that the trial court abused its discretion in sentencing him to consecutive sentences, and we therefore do not address that aspect of his sentence.

Judgment of sentence affirmed.

622 A.2d 347

**Lorrie GOSS, Appellant,**

v.

**Randall L. TIMBLIN.**

Superior Court of Pennsylvania.

Submitted Nov. 16, 1992.

Filed March 12, 1993.

218

Mary Jo Dillon, Butler, for appellant.

Marilyn J. Horan, Butler, for appellee.

Before CIRILLO, TAMILIA and HESTER, JJ.

HESTER, Judge.

Lorrie Goss appeals from the April 21, 1992 order entered by the Court of Common Pleas of Butler County in this support action. She formerly was married to Randall Timblin, appellee, and has remarried since the divorce. Appellant sought an increase in support to pay for the post-secondary educational expenses of Jeison, the parties' youngest child, who lives with appellant. The parties executed a separation agreement on November 7, 1984, in which they agreed, "Both parties shall assist the children to obtain a college education to the best of their then financial ability." The trial court ordered appellee to pay $175.00 per month for Jeison's tuition and expenses. Appellant argues that the trial court erred in calculating Jeison's educational expenses by not specifically

considering her contribution to Jeison's room and board and by reducing Jeison's anticipated educational costs by deducting an amount equal to a loan that she obtained to pay for Jeison's tuition. We agree and reverse and remand.

The record reveals the following. The parties were married on June 1, 1970, in Butler, Pennsylvania. They separated in February, 1982, and divorced on November 4, 1984. Two children were born of the marriage, Randall Jr., born October 10, 1970, and Jeison, born December 17, 1972. Both parties since have remarried, and appellee has a six-year-old daughter by his current wife. Both Randall Jr. and Jeison have attained their majority and reside with appellant. However, since Randall Jr. has not pursued higher education, we are concerned only with support for Jeison.

Jeison, who is over eighteen, chose to attend the Art Institute of Pittsburgh for training in the graphic arts. He anticipates earning an associate degree in visual communications in two years instead of three. In the parties' separation agreement, appellee agreed to assist the children to obtain a college education to the best of his financial ability "at that time." Appellant filed a petition for increased support to pay for Jeison's college expenses in June, 1991. The trial court adopted the master's findings with respect to the income and expenses of the parties but reduced appellee's obligation from $350 to $175 per month. Appellant filed this appeal contending that this amount is inadequate and that the court erred in its calculations.

Appellee is employed at Measuray Corporation as an operations manager and nets approximately $3,350 per month. His claimed expenses include $1,929 for mortgage and property taxes, $240 for utilities, $130 for insurance, $220 for automobile expenses, $600 for food, $112 for medical expenses, and $320 for child care. This totals $3,551 per month. Thus, his expenses currently exceed his income.

Appellant is a claim analyst at Nationwide Insurance Company and nets approximately $1,327 per month. Appellant's monthly expenses include $395 for mortgage, $260 for utilities, $300 for food, and $94 for health insurance. Her monthly

expenses total $1,049, which leaves approximately $278 per month of income unallocated. Jeison works part-time at Friedman's Supermarket earning at $4.25 per hour or approximately $85 per week. His earnings since have risen slightly due to a pay raise.

Jeison's academic program lasts eight quarters, and he will earn an associate's degree. The program normally is completed in three years, with the summers free. Jeison, however, wants to complete the program in two years by continuing school during the summer. He hopes this faster pace will permit him to continue his education by obtaining a bachelors degree. He lives with appellant at home and commutes to school in a Volkswagen, which he owns and maintains. Jeison to date has done very well in this program.

The trial court calculated that the amount of tuition not covered by loans equalled $1,530 the first year, $1,200 the second, and none for the third year, or a total of $2,730. The court then added $3,510 for additional mandated costs for art supplies. It added these two figures together to calculate a total of $6,250 not met by the previously-approved loans. The court then divided this sum by thirty-six months and set appellee's support obligation at $175 per month. It also found that Jeison was earning enough to pay for his own transportation, food, and lodging. It finally concluded that $175 per month would not burden appellee unduly.

█ We initially note that appellee specifically agreed to contribute to the costs of Jeison's education. In *Blue v. Blue*, 532 Pa. 521, 616 A.2d 628 (1992), our Supreme Court overruled prior case law propounded by this court and determined that there is no obligation by parents to contribute to the post-secondary educational expenses of a child in Pennsylvania, absent enactment of such a duty by our legislature. Since appellant specifically agreed in the separation agreement to contribute to college education to the best of his financial ability, however, the resolution of this case becomes a matter of interpretation of language set forth in the separation agreement in accordance with principals of contract law. *See Trunkwalter v. Truckwalter*, 421 Pa.Super. 308, 309–311, 617

A.2d 1308, 1309 (1992) (provision to pay for higher education in a settlement agreement is enforceable on its own terms even absent a legal duty to do so).

It is well-established that a settlement agreement between a husband and wife in Pennsylvania is governed by the law of contracts unless the agreement states otherwise. *Brower v. Brower*, 413 Pa.Super. 48, 56, 604 A.2d 726, 730 (1992). *See also De Witt v. Kaiser*, 335 Pa.Super. 258, 262, 484 A.2d 121, 123 (1984) (interpretation of contract terms are determined pursuant to the rules for contracts generally).

Our standard of review for contracts is clear. In *PBS Coals, Inc. v. Burnham Coal Co.*, 384 Pa.Super. 323, 328, 558 A.2d 562, 564 (1989), we stated:

> The paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties. *Greene v. Oliver Reality, Inc.*, 363 Pa.Super. 534, 526 A.2d 1192 (1987). In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly. *Daniels v. Bethlehem Mines Corp.*, 391 Pa. 195, 137 A.2d 304 (1958).

Instantly, the sole issue before the trial court was the determination of the ability of both parties to contribute to Jeison's educational needs. "In the absence of fraud, mistake, overreaching or the like, it is not the function of the court to redraft a contract to be more favorable to a given party than the agreement which that party chose to enter." *Id.* In interpreting the separation agreement, the court is not to insert language not placed there by the parties. *Daniels v. Bethlehem Mines, supra.* Consequently, the court's role was to establish what amount represented the most the parties reasonably agreed they could contribute in relation to their financial ability.[1]

1. We note with interest the fact that appellee has incurred significant financial obligations since he agreed contractually to provide college support for his child. While the trial court looked at appellee's reasonable expenses in terms of present obligations, we believe that care must be taken that litigants do not effectively void their contractual obli-

■ Appellant first argues that the trial court erred in its calculation of Jeison's educational costs in that it incorrectly determined the amount of Jeison's expenses for education. She contends that the costs should include expenses for room, board, necessary transportation, and medical insurance, which are all necessary adjunct expenses of his education. Specifically, appellant asserts that Jeison will incur transportation costs over the next two years in lieu of boarding at school. During the same period, appellant asserts she will incur costs of $7,640 to provide room and board for Jeison to live at home in lieu of the expense of his boarding at school. She obtained this figure by dividing her expenses per year by three people (herself and her two children). In addition, appellant contends that while the yearly cost of Jeison's health insurance and eye exams are borne by her, Jeison would bear this cost if he were not in school and working. Appellant asserts that these expenses, which exceed $13,000, should have been included by the court in the total cost of Jeison's education, which the court utilized to determine the amount of appellee's support. She thus contends that appellee should pay more in accordance with the provisions of their separation agreement.

gation to provide college support by their subsequent, voluntary assumption of consumer debt.

Certainly, a party's ability to help with college must be viewed in the context of his available resources and financial ability. However, appellee's present expenses indicate that he enjoys a substantially better lifestyle now than he did when the parties divorced. His mortgage is nearly five times that of appellant. Yet, appellee wants to reduce his responsibility to provide college to his child by using the debt *voluntarily* incurred to underwrite this better lifestyle.

A party cannot be permitted to incur what are lavish or unreasonable expenses when viewed in context of how the party lived when the contract was signed and then use those expenses as an offset to his financial obligation to pay for college. If this is permitted, people routinely will be able to avoid their contractual obligation to provide college assistance by making unreasonable purchases. A party should not become impoverished to pay for college; however, a party should not intentionally incur debt to purchase a large house and other consumer goods but then contest his obligation to assume debt to finance college for a child when the party agreed to pay for college. This should not be permitted under general contract principles which provide that the reasonable expectations of the parties at the time the contract is signed must be fulfilled.

Appellant relies upon *Deiley v. Deiley,* 281 Pa.Super. 288, 422 A.2d 172 (1980), for the proposition that it is appropriate to include the costs of room and board within the costs of an education. In *Deiley,* a daughter attended Georgetown University, and we found that the costs of room and board properly were included in the total expenses deemed appropriate in setting the amount of support. Appellant argues that room and board equally were appropriate considerations in this case since they were necessary for Jeison successfully to complete his program. She asserts it does not matter that these costs were not incurred separately at the school, since they still were necessary.

We reject the assertion that equivalent imputed costs of room and board at school should be included. However, we do agree with appellant that it is appropriate to include within the cost of Jeison obtaining his college education all the additional expenses incurred by appellant on his behalf that she otherwise would not have paid if Jeison were working. These expenses would include extra food, increased utilities, medical insurance, and commuting costs. These are necessary adjunct expenses required in order for Jeison successfully to complete his program. Consequently, we direct the trial court on remand to add these expenses to its determination of Jeison's educational costs.

Next, appellant argues that the trial court improperly deducted a Parent Plus Loan in the amount of $3,880 incurred by her to pay for Jeison's expenses before calculating unmet expenses. The trial court subtracted this loan, together with Jeison's Stafford student loans to determine what costs were not met and therefore, what level of support would be required from appellee. In effect, she asserts, inclusion of this loan in Jeison's resources improperly lowered the cost of education to which appellee should contribute.[2]

clarified in light of the the additional expenses which must now be included to calculate the cost of Jeison's education.