**Commonwealth v. Urbina-Nevarez**

*Jennifer Buck, assistant attorney general,* for Commonwealth.

*Allen Daringer,* for defendant.

LUDGATE, *J.,* February 27, 2009—This opinion is written pursuant to Pa.R.A.P. 1925(a), following the reinstatement of the defendant's direct appeal nunc pro tunc. The court adopts and incorporates its PCRA opinion dated January 13, 2009.

## I. PROCEDURAL HISTORY

Beginning on August 28, 2006, a jury trial was held before Judge Linda K.M. Ludgate. Defendant Pablo Urbina-Nevarez, a/k/a Frank Reyes was tried jointly with

co-defendants Daniel Encarnacion-Rivera, Melba Santana and Luciano Brito.[1] The defendant was charged with two counts of corrupt organizations,[2] one count of criminal conspiracy,[3] two counts of possession of a controlled substance,[4] two counts of possession with intent to deliver a controlled substance[5] and one count of criminal use of a communication facility.[6]

The charges against the defendant arose out of a broader investigation into drug distribution in the city of Reading. In fall of 2004, Troopers Troy Greenawald and Teresa Cloman of the Pennsylvania State Police Department, Troop "L", Reading, began a wiretap investigation regarding Peter Borelli, Alfredo Alicea and Jason Hummel on suspicion that Borelli was selling large quantities of cocaine throughout Berks County while using Alicea and Hummel to deliver the cocaine on his behalf. (N.T. 8/28/2006-9/1/2006, p. 286.) Initially, three cellular phones believed to be in use by Borelli, Alicea and Hummel were wiretapped. In time, eight additional phones were monitored over the next three months. (N.T. 8/28/2006-9/1/2006, pp. 290, 294.) Wiretapped conversations revealed that Borelli was receiving approximately one-half kilogram of cocaine per week. (N.T. 8/28/2006-9/1/2006, p. 294.) The relevant facts and

---

1. The evidence against the three co-defendants involved drug transactions discovered within the same investigation, but wholly distinct from transactions involving the defendant.

2. 18 Pa.C.S. §911(b)(3), § 911(b)(4).

3. 18 Pa.C.S. §903.

4. 35 P.S. 780-113(a)(16).

5. 35 P.S. 780-113(a)(30).

6. 18 Pa.C.S. §7512.

evidence are stated in greater detail below in analysis of the sufficiency of the evidence as to each count in order to avoid duplication.

On September 12, 2006,[7] the jury returned a verdict convicting the defendant on all counts. On September 26, 2006, the defendant was sentenced to 16 to 32 months incarceration for Count 1, corrupt organizations, 18 Pa.C.S. §911(b)(3), to run consecutive with Count 5 and concurrent with Counts 2, 3 and 10; 16 to 32 months incarceration for Count 2, corrupt organizations,18 Pa.C.S. §911(b)(4), to run consecutive with Count 5 and concurrent with Counts 1, 3 and 10; 6 1/2 years to 13 years incarceration for Count 3, criminal conspiracy to commit delivery of cocaine greater than 1,000 grams, 18 Pa.C.S. §903, to run consecutive with Count 5 and concurrent with Counts 1 and 2; 4 to 8 years incarceration for Count 5, possession with intent to deliver a controlled substance, 500 grams cocaine, 35 P.S. 780-113(a)(30) (March 10, 2005), to run consecutive with Count 7; 7 to 14 years incarceration for Count 7, possession with intent to deliver a controlled substance, 500 grams cocaine, 35 P.S. 780-113(a)(30) (March 14, 2005), with 111 days credit time; six to 12 months incarceration for Count 10, criminal use of a communication facility, 18 Pa.C.S. §7512(a) (January 28, 2005 through April 25, 2005), to run concurrent with Count 1, 2 and 3, consecutive with Count 5. Counts 4 and 6, possession of a controlled substance, 35 P.S. 780-113(a)(16), merged for sentencing purposes and Counts 8 and 9 were withdrawn before

---

7. This court's PCRA opinion dated January 13, 2009 mistakenly stated the defendant was convicted on July 6, 2006.

trial. This court sentenced the defendant to a total of 17 1/2 to 35 years incarceration. Post-sentence motions were denied on October 10, 2006.

On November 9, 2006, the defendant, through his attorney, Michael Dautrich, Esquire, filed a timely notice of appeal. On that same date, Attorney Jack McMahon entered his appearance for the defendant in the above-captioned matter and filed another notice of appeal. On November 20, 2006, Attorney Dautrich filed with this court a petition to withdraw as counsel in the above-docketed case, which was granted by this court on November 21, 2006. On November 9, 2006, the defendant, through his new counsel Jack McMahon, Esquire, filed a timely notice of appeal from the judgment of sentence. This court, on November 20, 2006, ordered the defendant to file a statement of matters complained of on appeal "no later than 14 days after the entry of such order" pursuant to 42 Pa.C.S. §1925(b). After an extension was granted on December 4, 2006, Mr. McMahon failed to file a 1925(b) statement at any point.

On January 10, 2007, this court issued a memorandum opinion, requesting that the Superior Court dismiss the appeal because the defendant failed to preserve any issues for review due to failure to file a 1925(b) statement.

The Superior Court dismissed the defendant's appeal on this basis in an unpublished opinion on March 20, 2007. *Commonwealth v. Urbina-Nevarez,* no. 1976 MDA 2006 slip op. (Superior Court, March 20, 2007).

The defendant filed a pro se motion for post-conviction relief on February 13, 2008. This court appointed Allen Daringer, Esquire, to represent the defendant for PCRA

purposes on February 25, 2008. After an extension was granted on April 28, 2008, the defendant, through counsel, filed an amended petition for post-conviction relief on July 31, 2008. A PCRA hearing was held on November 10, 2008. For reasons stated in this court's PCRA opinion dated January 13, 2009, the defendant's appeal was reinstated nunc pro tunc. The defendant, through PCRA counsel Daringer, filed this timely 1925(b) statement on February 3, 2009.

This opinion is written pursuant to Pa.R.A.P. 1925(a) and for the following reasons, this court respectfully requests that the instant appeal be denied.

## II. ISSUES RAISED BY THE DEFENDANT

The defendant raises the following issues for review in his 1925(b) statement of errors:

(1) The Commonwealth produced insufficient evidence to show that defendant was guilty beyond a reasonable doubt of corrupt organizations,[8] corrupt organizations,[9] criminal conspiracy,[10] possession of a controlled substance,[11] possession with intent to deliver a controlled substance,[12] possession of a controlled substance,[13] pos-

---

8. 18 Pa.C.S. §911(b)(3)—Predicate acts—Delivery of controlled substance and/or possessed with intent to deliver a controlled substance.

9. 18 Pa.C.S. §911(b)(3)—Predicate acts—Conspired to possess controlled substances and conspired to possess with the intent to deliver controlled substance. (18 Pa.C.S. §903.)

10. 18 Pa.C.S. §903.

11. 35 P.S. 780-113(a)(16) (March 10, 2005).

12. 35 P.S. 780-113(a)(30) (March 10, 2005).

13. 35 P.S. 780-113(a)(16) (March 14, 2005).

session with intent to deliver a controlled substance,[14] and criminal use of a communication facility.[15]

(2) The Commonwealth's evidence showed that defendant merely associated with people who may have been involved in the possession or sales of controlled substances.

(3) The Commonwealth did not link defendant with any sale or re-sale of controlled substances.

(4) The Commonwealth did not produce any physical evidence to show that defendant possessed or sold any controlled substances.

(5) The jury verdicts were against the weight of the evidence for the following reasons:

(a) Jacabo Blanco Garcia, whose testimony was incredible and contradictory, was the only witness to identify defendant having been involved in illegal activity.

(b) The intercepted conversations between defendant and others do not establish defendant's guilt.

(c) The Commonwealth produced no evidence that defendant was associated with an enterprise.

(d) The Commonwealth failed to produce evidence that defendant conducted or participated in the trafficking of cocaine.

(e) The Commonwealth did not show that defendant engaged in a pattern of racketeering activity.

---

14. 35 P.S. 780-113(a)(30) (March 14, 2005).

15. 18 Pa.C.S. §7512(a) (January 28, 2005 through April 25, 2005).

(f) The Commonwealth did not show that defendant possessed cocaine on any of the dates in question.

(g) The Commonwealth did not show that defendant delivered cocaine on any of the dates in question.

(h) The Commonwealth did not show that defendant aided or abetted or facilitated the possession or delivery of cocaine on any date in question.

(i) Law enforcement authorities did not find any controlled substances in the search of defendant's home or vehicle.

(j) The Commonwealth did not show that defendant participated in a drug delivery.

(6) The court sentence was excessive for the following reasons:

(a) Defendant had no prior record.

(b) Consecutive sentences for delivery charges and the conspiracy charges were unsupported based on the facts.

(c) The court considered defendant's absence from the commencement of the trial as determining sentence.

## III. ANALYSIS

### 1. *Sufficiency of Evidence*

When determining sufficiency of the evidence claims, the court must determine whether the evidence and all reasonable inferences therefrom, drawn in the light most favorable to the verdict winner, was sufficient to enable the fact-finder to find every element of the crime charged beyond a reasonable doubt. *Commonwealth v. Sullivan,* 864 A.2d 1246, 1249 (Pa. Super. 2004). The Common-

wealth's burden may be met through wholly circumstantial evidence. *Id.* The fact-finder is free to believe all, part, or none of the evidence presented. *Id.* The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the finder of fact, unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. McFadden,* 850 A.2d 1290 (Pa. Super. 2004). "Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. McFadden,* 850 A.2d 1290, 1293 (Pa. Super. 2004).

Because the counts of corrupt organizations, conspiracy and criminal use of a communication facility are based in part on the predicate acts of possession of a controlled substance and possession with intent to deliver a controlled substance, the court will first address the sufficiency of the evidence as to the possession convictions.

To be convicted of possession of a controlled substance with intent to distribute,[16] the Commonwealth must prove both possession of a controlled substance and intent to deliver the controlled substance. *Commonwealth v. Ratsamy,* 885 A.2d 1005 (Pa. Super. 2005).

_____

16. The defendant was also convicted of two counts of possession of a controlled substance. As a lesser included offense which merged for sentencing purposes, the court need not analyze these convictions, as sufficient evidence to sustain possession with intent to distribute is also sufficient to sustain possession alone.

Possession of a controlled substance need not be proven by physical evidence. The Commonwealth may establish the essential elements of this crime wholly by circumstantial evidence; the court looks to all facts and circumstances in each case surrounding the possession of the controlled substance. *Commonwealth v. Ratsamy,* 594 Pa. 176, 182-83, 934 A.2d 1233, 1237 (2007); *Commonwealth v. Torres,* 421 Pa. Super. 233, 617 A.2d 812 (1992), *appeal denied,* 535 Pa. 618, 629 A.2d 1379 (1993).

Possession includes actual possession as well as constructive possession; constructive possession is an exercise of conscious dominion, that is, knowledge of the substance, the power to control the substance and the intent to exercise that control. *Commonwealth v. Perez,* 931 A.2d 703 (Pa. Super. 2007). The purpose of the constructive possession rule is to expand the scope of possession to include cases where possession cannot be shown at time of arrest but there is a strong inference of possession. *Commonwealth v. Battle,* 883 A.2d 641 (Pa. Super. 2005).

The intent to deliver may be inferred from the facts and circumstances surrounding the case, including the method of packaging of the drug. *Commonwealth v. Harper,* 416 Pa. Super. 608, 611 A.2d 1211 (1992). Intent to distribute may also be inferred from the quantity of drugs possessed and other circumstances such as lack of consumption paraphernalia. *Commonwealth v. Torres,* 421 Pa. Super. 233, 617 A.2d 812 (1992).

The defendant was convicted of possession of a controlled substance and possession with intent to distribute based upon two separate deliveries. On March 10, 2005,

calls were intercepted between Borelli, Alberto Sanchez-Resto, Jacabo Blanco-Garica a/k/a achu or cachou and the defendant. In the first call, which occurred at approximately 4:17 p.m., Borelli asked Sanchez-Resto "you gonna be ready for me." Trooper Greenawald interpreted this to mean will Sanchez-Resto have cocaine for Borelli to purchase. Borelli's next call arranged to pick up the cocaine. (N.T. 8/28/2006-9/1/2006, p. 429; Commonwealth's exhibits 32, 33.) About one minute after speaking with Borelli, Sanchez-Resto called Blanco-Garcia, his cocaine supplier, and asked about "[b]londes, blondes, blondes", which Trooper Greenawald stated was code for cocaine. Blanco-Garcia told Sanchez-Resto to call him when he is at the "bat cave." (N.T. 8/28/2006-9/1/2006, pp. 431-32; Commonwealth's exhibit 34.) At approximately 5:48 p.m., Sanchez-Resto told Blanco-Garcia to "head to brother's", repeating that Blanco-Garcia was to go to his house, not the "bat cave." (N.T. 8/28/2006-9/1/2006, pp. 432-33; Commonwealth's exhibit 37.) Trooper Greenawald believed the defendant to be Sanchez-Resto's brother.[17] Trooper Greenawald testified that the "bat cave" was in reference to 1018 Chestnut Street, Reading and the defendant's residence was 1133 Scott Street, Reading. (N.T. 8/28/2006-9/1/2006, pp. 432-33.) Approximately 10 minutes later, Sanchez-Resto called the defendant to tell him that Blanco-Garcia was coming over and called Blanco-Garcia to confirm he was coming, and Blanco-Garcia

---

17. Whether Sanchez-Resto and the defendant were actually brothers was never confirmed by Trooper Greenawald. However, Sanchez-Resto frequently referred to the defendant as "brother" or referred to his apartment as "brother's." Also, a family relationship is not vital to any element of any of the crimes charged.

stated he was on his way. (N.T. 8/28/2006-9/1/2006, p. 435; Commonwealth's exhibits 38, 39.) Blanco-Garcia testified that he went to the defendant's home and delivered "half a job" or half a kilogram of cocaine. (N.T. 8/28/2006-9/1/2006, pp. 866-67.)

Borelli called Sanchez-Resto at approximately 6:10 p.m. on March 10 about money he owed to Sanchez-Resto and the defendant, seeking to arrange a meeting to pay the money. (Commonwealth's exhibit 41.) Borelli asked if they are to meet at "the same place", meaning 1018 Chestnut Street, Reading, to which Sanchez-Resto stated he will advise Borelli regarding the location of the meeting. (N.T. 8/28/2006-9/1/2006, p. 436; Commonwealth's exhibit 42.) Next, Sanchez-Resto called the defendant, and the defendant said to send Borelli. Sanchez-Resto then sent Borelli to the defendant's apartment. (N.T. 8/28/2006-9/1/2006, p. 438; Commonwealth's exhibit 44, 45.)

Trooper Joseph Thompson was doing stationary surveillance on Borelli on March 10, 2005 at approximately 5:42 p.m., in the area of the Bakery Apartments near the intersection of Third and Walnut Streets in Reading. (N.T. 8/28/2006-9/1/2006, p. 449.) At that time, Trooper Thompson observed a red Dodge Intrepid park. A Dominican-looking male exited the car and entered the Bakery Apartments. *Id.* Three to four minutes later, the same Dominican male exited the building, got in the red Dodge Intrepid and drove off. *Id.* Trooper Thompson followed the car onto Lancaster Avenue. Trooper Thompson identified the Dominican male as the defendant. (N.T. 8/28/2006-9/1/2006, pp. 449-50.) At approximately 6 p.m., Trooper Jonathan Kinsey was conducting surveil-

lance and observed a red Dodge Intrepid parked in front of 1133 Scott Street, Reading. (N.T. 8/28/2006-9/1/2006, pp. 468-69.)

Trooper Cory Remp also conducted surveillance on March 10, 2005 at approximately 7:22 p.m. At this time, Trooper Remp followed Borelli and Alicea from the Bakery Apartments at Third and Franklin Streets in Reading to 1133 Scott Street in Reading. (N.T. 8/28/2006-9/1/2006, p. 463.) Upon arrival, Borelli got out of the car and instructed Alicea to park. (Id.)

The sequence of events giving rise to the second convictions for possession and possession with intent to distribute began on March 13, 2005. On that date at approximately 7:47 and 7:49 p.m, two phone calls were intercepted between Sanchez-Resto, Alicea and Borelli, wherein the men arranged for Sanchez-Resto to go to the Bakery Apartments to collect money for cocaine delivered on March 10, 2005. (N.T. 8/28/2006-9/1/2006, p. 472; Commonwealth's Exhibit 47-8.) The following day at approximately 4:46 p.m, a phone call was intercepted wherein Sanchez-Resto said to Borelli "[m]y brother told me that he told you that it was 575 that he gave you. I didn't know if you knew that", to which Borelli replied "nah it was 525." (Commonwealth's exhibit 49.) This indicates that the defendant told Sanchez-Resto that he had given Borelli 575 grams of cocaine, but Borelli weighed it and it was only 525 grams. (N.T. 8/28/2006-9/1/2006, p. 473.) Approximately two and a half minutes later, Sanchez-Resto called the defendant to tell him of the discrepancy in the amount delivered and told the defendant to reach out to Borelli. Sanchez-Resto gave the defendant Borelli's Nextel direct connect number.

(N.T. 8/28/2006-9/1/2006, p. 474; Commonwealth's exhibit 50-2.) The next conversation between Borelli and Sanchez-Resto indicated that the defendant had come to see Borelli to resolve the discrepancy; Borelli said he didn't believe that Sanchez-Resto and the defendant had ever cheated him before, so he was not going to make a big deal of the discrepancy, that he had the money for payment and he was ready for more cocaine. (N.T. 8/28/2006-9/1/2006, p. 476; Commonwealth's exhibit 54.)

Trooper James McCoy conducted surveillance at the Bakery Apartments in the area of South Third and Franklin Streets in Reading on March 14 of 2005. (N.T. 8/28/2006-9/1/2006, p. 525.) At approximately 7:23 p.m., Trooper McCoy observed a red Intrepid in the area. *(Id.)* Another conversation was intercepted on March 14, 2005 at approximately 7:43 p.m. This conversation was between Sanchez-Resto and Jacabo Blanco-Garcia, wherein Sanchez-Resto ordered a "half of the blonde" or half-kilogram of cocaine from Blanco-Garcia. (N.T. 8/28/2006-9/1/2006, p. 475; Commonwealth's exhibit 53.)

At approximately 7:39 p.m., Trooper Francis Thompson was conducting surveillance of the defendant, and followed him and two females to a grocery store called Pioneer on Lancaster Avenue in Reading. The three individuals rode in the same red Dodge Intrepid which Trooper Thompson observed on March 10, 2005. Trooper Thompson followed the defendant and the two females into the store, shopping in the same aisles as the defendant. (N.T. 8/28/2006-9/1/2006, pp. 450-51; Common-

wealth's exhibit 49B.) While in the store, the defendant was on his cellular phone saying either "Cachoo" "Gachoo" "Hachoo" or "Gachoo." (N.T. 8/28/2006-9/1/2006, p. 540.) Trooper Thompson called the monitoring plant and verified that the cellular phone presently being used by the defendant was being intercepted. *(Id.)* Trooper Remp continued to follow the car and observed a Hispanic male park a red Dodge Intrepid at 1133 Scott Street with two Hispanic females at approximately 8:18 p.m. (N.T. 8/28/2006-9/1/2006, p. 464.) Trooper McCoy also observed the red Intrepid park at 1133 Scott Street in Reading, and at approximately 8:15 p.m, observed two Hispanic females and one Hispanic male exit the car and enter 1133 Scott Street. (N.T. 8/28/2006-9/1/2006, p. 526; Commonwealth's exhibit 49A.)

At approximately 8:44 p.m., Borelli called Sanchez-Resto and indicated he wanted more cocaine; Sanchez-Resto replied that Borelli should wait 10 minutes because the defendant "is buying some stuff and he is with his woman." (N.T. 8/28/2006-9/1/2006, p. 477; Commonwealth's exhibit 55.) In order to obtain the cocaine to sell to Borelli, Sanchez-Resto called his supplier, Blanco-Garcia, at approximately 8:51 p.m. (Commonwealth's exhibit 56.) Blanco-Garcia arrived at the defendant's apartment at approximately 9:03 p.m. (N.T. 8/28/2006-9/1/2006, pp. 478-79; Commonwealth's exhibit 58.) Blanco-Garcia testified that he delivered a half-kilogram of cocaine to the defendant at his home at that time. (N.T. 8/28/2006-9/1/2006, p. 869.) Blanco-Garcia and Sanchez-Resto arranged to meet so Sanchez-Resto could pay for the cocaine. (Commonwealth's exhibit 59.) At approximately 9:04 p.m., Sanchez-

Resto told Borelli to go to the defendant's apartment to get the cocaine, knowing that Blanco-Garcia had already delivered cocaine to the defendant. (N.T. 8/28/2006-9/1/2006, p. 480; Commonwealth's exhibit 60.) At approximately 9:15 p.m., Trooper McCoy observed Peter Borelli arrive at the address in a white Avalanche. (N.T. 8/28/2006-9/1/2006, p. 528; Commonwealth's exhibit 49A.)

A search warrant was executed at the defendant's residence, 1133 Scott Street on April 26 of 2005. (N.T. 8/28/2006-9/1/2006, p. 769.) The execution of the warrant recovered $5,000 in U.S. currency from a dresser drawer, $100 in U.S. currency in a man's wallet, $91 in U.S. currency in a pants pocket, a Taurus .380 semi-automatic pistol with an empty chamber and a loaded clip, two gray scales, and a red 1999 Dodge Intrepid, VIN #2B3HD46R7XH760387, which was searched and impounded. (N.T. 8/28/2006-9/1/2006, pp. 774-79; Commonwealth's exhibits 110, 114.) Proof of insurance and title to the car were also recovered, both bearing the defendant's name and his address. (N.T. 8/28/2006-9/1/2006, pp. 777-78.) The defendant was arrested immediately following the execution of the search warrant. (N.T. 8/28/2006-9/1/2006, p. 782.)

Trooper Troy Greenawald testified that, based upon his training and experience in drug investigations, when one receives cocaine in excess of 100 grams, that person is obtaining the cocaine for purpose of distribution, not personal use. (N.T. 8/28/2006-9/1/2006 p. 340.) Typically, purchases for personal use are in the amounts of half a gram to three-and-a-half grams. *(Id.)*

Although no cocaine was recovered during the execution of the search warrant of the defendant's home, the convictions for possession and possession with intent to deliver cocaine are supported by sufficient evidence, some direct and some circumstantial. Blanco-Garcia's testimony that he delivered cocaine to the defendant is sufficient for the finder of fact to determine the defendant did possess cocaine on both March 10 and March 14, 2005. This finding is also supported by the numerous phone calls and surveillance.

There are three facts in evidence upon which the jury could permissibly infer the defendant possessed the cocaine with intent to deliver. First, the fact that delivery was actually made. Second, the large amounts of cocaine delivered preclude possession for personal use. Finally, the recovery of $5,191 in cash and two scales are consistent with the measuring of cocaine and its sale.

In this case, the Commonwealth also met its burden of producing sufficient evidence that the defendant was associated with a racketeering enterprise, as manifested through multiple racketeering acts, namely the delivery of cocaine on March 10 and March 14, 2005.

To obtain a conviction for corrupt organizations, 18 Pa.C.S. §911(b)(3), the Commonwealth must prove beyond a reasonable doubt that the defendant was "employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Commonwealth v. Dennis,* 421 Pa. Super. 600, 605, 618 A.2d 972, 974 (1992); 18 Pa.C.S. §911(b) (3).

An enterprise is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." *Commonwealth v. Dellisanti,* 583 Pa. 106, 113, 876 A.2d 366, 370 (2005). A retail store from which a defendant sold drug paraphernalia was an "enterprise" for purposes of the corrupt organizations act. *(Id.)* Similarly, where a defendant and other persons are in control of the process by which drugs would be picked up and delivered, in transactions occurring over a period of time, an enterprise has been found to exist. *Dennis, supra.*

The facts of this case as relevant to the counts of corrupt organizations and conspiracy are as follows:

On February 22, 2005, two phone calls were intercepted between the defendant and Borelli at approximately 3:04 p.m. and 4:18 p.m. (Commonwealth's exhibits 22 and 23.) Trooper Greenawald, based on his training, experience and knowledge of the investigation, interpreted these calls to mean that Borelli was waiting to collect money, which he would use to buy cocaine from the defendant at 5 p.m. Borelli asked the defendant if he would have something for him, to which the defendant said he would. (N.T. 8/28/2006-9/1/2006, p. 403.) At approximately 5:54 p.m., a phone call was intercepted between Alicea and the defendant. (Commonwealth's exhibit 24.) Another call took place between Borelli and the defendant at approximately 6:06 p.m. (Commonwealth's exhibit 25.) Trooper Greenawald interpreted the two conversations to constitute planning

for Borelli to meet the defendant, pay the defendant money for cocaine previously delivered and receive new cocaine. (N.T. 8/28/2006-9/1/2006, p. 405.)

On the same day, the following conversation was intercepted at approximately 6:21 p.m. between Borelli, hereinafter "PB" and the defendant, hereinafter "PN":

"PN: Hey you . . . get on your way.

"PB: There ain't no love

"PN: There's love. Get on your way.

"PB: That's fine. I'll go over there. Give me 10 minutes.

"PN: What was that?

"PB: Give me 15 minutes . . . and I'm there.

"PN: Fifteen? Alright?

"PB: Yeah. Fifteen minutes . . . and I'm there.

"PN: Okay." Commonwealth's exhibit 26.

Trooper Greenawald stated that Borelli's statement of "there ain't no love" was a request for cocaine by Borelli and the defendant's response indicated that he had cocaine and Borelli should come get it. (N.T. 8/28/2006-9/1/2006, pp. 405, 415.) At approximately 6:36 p.m., Borelli called the defendant again, indicating that he had arrived at the defendant's apartment and the defendant needed to let him in. (N.T. 8/28/2006-9/1/2006, p. 407; Commonwealth's exhibit 27.) About an hour and 13 minutes thereafter, the defendant called Borelli to ask if he arrived ok. (Commonwealth's exhibit 28.)

Witness Sandro Rojas testified that he worked delivering cocaine for Blanco-Garcia in January of 2005. (N.T.

8/28/2006-9/1/2006, p. 568.) Blanco-Garcia's hiring of Rojas was approved by his drug supplier, who was also Blanco-Garcia's brother-in-law, one Elson Paulino a/k/a Jose. (N.T. 8/28/2006-9/1/2006, p. 572.) Blanco-Garcia also employed a man named Geraldo Martinez. (N.T. 8/28/2006-9/1/2006, p. 627.) Rojas obtained an apartment at 11th and Pike Streets in Reading where he and Blanco-Garcia would store drugs. (N.T. 8/28/2006-9/1/2006, p. 570.) This apartment was nicknamed "the bat cave." (N.T. 8/28/2006-9/1/2006, p. 574.) Rojas met Blanco-Garcia's customers, including the defendant, whom Rojas knew under the nickname "Gringo", and the defendant's brother, Sanchez-Resto, whom Rojas knew as "Heuri." (N.T. 8/28/2006-9/1/2006, p. 576.) Rojas also testified that, although his conversations with Blanco-Garcia never mention the word cocaine, the word was unnecessary because Rojas understood what they were talking about. (N.T. 8/28/2006-9/1/2006, p. 589.)

Blanco-Garcia testified that in 2001 he, along with his brother-in-law, Freddie Paulino, illegally entered the United States, through Texas, with the help of Elson. (N.T., 8/28/2006-9/1/2006, p. 744.) Blanco-Garcia testified that he and Freddie were caught by the immigration police in Texas and Elson paid $20,000 bail to have Blanco-Garcia and Freddie released from prison. Elson then paid to fly Blanco-Garcia and Freddie to Newark, New Jersey. (N.T., 8/28/2006-9/1/2006, p. 745.)

Blanco-Garcia testified that once he and Freddie arrived in New Jersey, they stayed for about one month with Elson's brother, Armando Paulino. After approxi-

mately one month. Elson sent another brother-in-law, Wilson Paulino, to retrieve Blanco-Garcia and Freddie from New Jersey and had Wilson bring Blanco-Garcia and Freddie to Reading, Pennsylvania. (N.T., 8/28/2006-9/1/2006, p. 745.) Blanco-Garcia testified that Elson was in the drug business in Reading and when Blanco-Garcia arrived in Reading, he too became involved in the drug business. (N.T., 8/28/2006-9/1/2006, p. 745.)

Blanco-Garcia testified that Elson was the owner, or the boss, of the drug business and Wilson was in charge of running the job. (N.T., 8/28/2006-9/1/2006, p. 746.) Blanco-Garcia and Freddie were in charge of running security of the apartment and of the drugs. (N.T., 8/28/2006-9/1/2006, p. 746.) Blanco-Garcia testified that he [Blanco-Garcia] was not delivering cocaine when he first arrived in Reading. However, Blanco-Garcia testified that he eventually began distributing cocaine in 2004 after Luis and Wilson went to jail and Freddie was deported. (N.T., 8/28/2006-9/1/2006, p. 747.) At that point, Blanco-Garcia testified that Elson put Blanco-Garcia in charge of distributing cocaine in Reading. Elson introduced Blanco-Garcia to all of his [Elson's] clients in Reading and it became Blanco-Garcia's job to distribute the cocaine to the Reading clients. (N.T., 8/28/2006-9/1/2006, p. 749.)

Blanco-Garcia testified that he would go to New Jersey to pick up between five and six kilos at one time. (N.T., 8/28/2006-9/1/2006, p. 749.) Blanco-Garcia would then give the cocaine to the Reading clients on credit. Thereafter, Blanco-Garcia would wait between one week and 15 days until the money would start to

come in. Then Blanco-Garcia would give the clients more cocaine on credit and more money would come in. (N.T., 8/28/2006-9/1/2006, p. 750.) Blanco-Garcia testified that he would count the money he received from selling the drugs and then give it to Elson. Elson would then pay Blanco-Garcia a percentage of what Blanco-Garcia sold. (N.T., 8/28/2006-9/1/2006, p. 751.) Blanco-Garcia testified that Elson would sell each kilo for approximately $22,000. (N.T., 8/28/2006-9/1/2006, p. 751.)

Blanco-Garcia testified that between January of 2005 and April of 2005, he obtained drugs from another man, Jorge Romero, because Elson sometimes had a difficult time obtaining the cocaine. (N.T., 8/28/2006-9/1/2006, p. 753.) Blanco-Garcia testified that Elson knew that Blanco-Garcia was getting drugs from Romero and he allowed Blanco-Garcia to do this in order to keep the clients "maintained" so that the clients did not get their drugs elsewhere. (N.T., 8/28/2006-9/1/2006, p. 753.) Blanco-Garcia testified that there came a time when business in Reading was busy, so Elson allowed Blanco-Garcia to get an assistant. (N.T., 8/28/2006-9/1/2006, p. 754.) Blanco-Garcia testified that Elson helped Blanco-Garcia get a false identification card, which had the name Andres Cruz-Bauza on it. (N.T., 8/28/2006-9/1/2006, p. 754.) Blanco-Garcia explained that Elson had a separate apartment in which the cocaine was kept in an attempt to protect himself and his family. (N.T., 8/28/2006-9/1/2006, p. 788.)

Blanco-Garcia further testified that he knew the defendant through his brother and from playing ball.

Blanco-Garcia knew the defendant by his nickname of "Gringo" and the defendant's brother by the name of "Heuri Reyes." (N.T. 8/28/2006-9/1/2006, p. 863.)

On March 4, 2005, several calls were intercepted between Alberto Sanchez-Resto and Peter Borelli. One call indicated that Sanchez-Resto was seeking to collect money for cocaine which he sold to Borelli on credit. Sanchez-Resto stated "[t]here is diamond around man that it's going to drive you crazy. Now you are going to be king." Trooper Greenawald interpreted this reference to "diamond" as meaning high quality cocaine. (N.T. 8/28/2006-9/1/2006, p. 426; Commonwealth's exhibit 29.) The following day, Alfredo Alicea arranged to pay money to Sanchez-Resto. (Commonwealth's exhibits 31, 32.)

On March 30, 2005, a telephone call was intercepted between Blanco-Garcia and the defendant, wherein the men arrange to meet; Blanco-Garcia states that he will send Sandro Rojas. (N.T. 8/28/2006-9/1/2006, p. 872; Commonwealth's exhibit 61.) Rojas collected money from the defendant. (N.T. 8/28/2006-9/1/2006, p. 576.) Approximately five hours, 14 minutes later, a telephone conversation was intercepted, wherein Blanco-Garcia complained to Rojas that the defendant had paid for drugs using many single dollar bills; Blanco-Garcia would have preferred 20 and 50 dollar bills. (N.T. 8/28/2006-9/1/2006, p. 579; Commonwealth's exhibit 63.) The defendant had paid Rojas approximately $10,000. (N.T. 8/28/2006-9/1/2006, p. 873).

When viewed in the light most favorable to the Commonwealth as verdict winner, the following facts can be

discerned from the record: Elson Paulino ran a drug trafficking enterprise, which supplied large quantities of cocaine to Jacabo Blanco-Garcia, who, with the aid of Sandro Rojas and Geraldo Martinez, distributed the cocaine throughout the city of Reading and Berks County. Alberto Sanchez-Resto was one customer of Blanco-Garcia, who would purchase cocaine in one-half kilogram installments. With the aid of the defendant, this cocaine would be sold to others, including Peter Borelli and Alfredo Alicea. Collectively, these individuals formed a racketeering enterprise.

Racketeering activity includes "any offense indictable under section 13 of the act of April 14, 1972 (P.L. 233, No. 64) known as The Controlled Substance, Drug, Device and Cosmetic Act [35 P.S. §780-113-101 et seq.]. 18 Pa.C.S. §911(h).

As discussed in greater detail in regards to the conviction for possession with intent to deliver a controlled substance, the predicate act of delivery of cocaine was established by the intercepted phone calls, which were corroborated by surveillance on March 10 and March 14 and the testimony of Blanco-Garcia and Rojas. This is per se racketeering activity as defined by section 911(h).

Being employed by or associated with the enterprise require only that the defendant know the basic structure of the enterprise and be aware of his role in the distribution scheme; it does not require that the defendant specifically know each person associated with the enterprise. *Commonwealth v. Donahue,* 428 Pa. Super. 259, 630 A.2d 1238 (1993).

The defendant's acts of accepting drugs from Blanco-Garcia, delivering the drugs to Borelli and collecting payment, is sufficient activity for the defendant to be associated with the enterprise. The defendant may not have known the complete hierarchy of distribution from Elson to Borelli, but such knowledge is not required.

Proof of a pattern of racketeering activity requires that the Commonwealth prove the defendant committed two or more acts which violated the same statute. *Commonwealth v. Wetton,* 405 Pa. Super. 1, 12, 591 A.2d 1067, 1074 (1991). Because the deliveries occurred on March 10 and March 14, the pattern of racketeering requirement is met, as both acts violated the same statute, being 35 P.S. 780-113(a)(16) and (a)(30).

The Commonwealth also met its burden of proving a violation of 18 Pa.C.S. §911(b)(4), corrupt organizations. This form of corrupt organizations requires evidence that the defendant conspired to violate 18 Pa.C.S. §911(b)(3), requiring an agreement to violate section 911(b)(3) and an overt act in furtherance of the agreement. *Wetton,* 405 Pa. Super. at 11, 591 A.2d at 1073.

The acceptance and delivery of cocaine by the defendant overwhelmingly established the overt act requirement. The communication between the defendant and other persons in the enterprise, most notably Sanchez-Resto, Borelli and Blanco-Garcia, as evidenced by the numerous intercepted phone calls, was sufficient to establish a criminal agreement to distribute cocaine.

The conviction for criminal conspiracy to commit delivery of a controlled substance is similarly supported by the evidence. To establish criminal conspiracy, the

Commonwealth must establish the defendant "(1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent, and (3) an overt act done in furtherance of the conspiracy. Circumstantial evidence may provide proof of the conspiracy. The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." *Commonwealth v. Bricker,* 882 A.2d 1008, 1017 (Pa. Super. 2005), see also, 18 Pa.C.S. §903(a). The Pennsylvania Superior Court went on to say that "an agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail." *Bricker, supra* at 1017. There is no requirement in Pennsylvania that in situations where more than one overt act is alleged that the jury must specify which of those acts is relied on in reaching a guilty verdict. *Commonwealth v. Stocker,* 424 Pa. Super. 189, 622 A.2d 333 (1993).

Again, the evidence of conspiracy is sufficient. The convictions for possession with intent to deliver cocaine on March 10 and 14 are a sufficient overt act from which an agreement could be inferred. The defendant's distribution of cocaine was so commonplace, those wishing to purchase it from him and Sanchez-Resto need not say more than a few code words. This shows knowledge of the parties of the agreement to distribute cocaine.

Finally, to sustain a conviction for criminal use of a communication facility, the Commonwealth must prove the defendant used a communication facility to commit, cause, or facilitate the commission or the attempt thereof of any crime which constitutes a felony under the Controlled Substance, Drug, Device, and Cosmetic Act. 18 Pa.C.S. §7512(a). The term "communication facility" means a public or private instrumentality used or useful in the transmission of signs, signals . . . sounds, data, or intelligence of any nature transmitted in whole or in part, including, but not limited to, telephone [and] wire . . . systems. 18 Pa.C.S. §7512(c).

The evidence in this case is overwhelming that the defendant would use cellular phones to facilitate the delivery and sale of cocaine in large quantities. This conviction is thus supported by sufficient evidence.

## 2. *Weight of the Evidence*

Because the defendant raises several claims of error concerning the weight of the evidence (claims 5a-5j), the court will address these claims together. Also, because the defendant's second, third and fourth claims essentially raise issues of weight of the evidence, although not labeled as such, the court will consider those claims with the other weight of the evidence claims.

The weight of the evidence is exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. McCloskey,* 835 A.2d 801, 809 (Pa. Super. 2003). "A motion for new trial on grounds that the verdict is contrary to the weight of the evidence

concedes that there is sufficient evidence to support the verdict, but contends, nevertheless, that the verdict is against the weight of the evidence." *Commonwealth v. Davis,* 799 A.2d 860, 865 (Pa. Super. 2002). Whether a new trial should be granted on grounds that it is against the weight of the evidence is addressed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Id.* In determining whether the verdict is against the weight of the evidence, the role of the trial court is to determine whether "notwithstanding all the facts, certain facts are so clearly of greater weight to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Widmer,* 560 Pa. 308, 320, 744 A.2d 745, 752 (2000) (citations omitted). Stated more concisely, the verdict should not be disturbed unless it is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Miller,* 555 Pa. 354, 367, 724 A.2d 895, 901 (1999).

Counsel raised specific arguments in the 1925(b) statement in support of the argument the verdict was contrary to the weight of the evidence. However, these arguments only state reasons why evidence should not have been believed or point out that certain elements of the charges were lacking direct evidence. By convicting the defendant, the jury, as finder of fact, presumably found Blanco-Garcia credible, and because the Commonwealth produced overwhelming circumstantial evidence upon which the jury could infer the elements for which there was no direct evidence, the court finds the verdict on all counts was not so contrary to the weight of the evidence such that it shocks its sense of justice.

## 3. *Sentencing*

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Burkholder,* 719 A.2d 346 (Pa. Super. 1998). This discretion is permitted because the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. *Commonwealth v. Mouzon,* 571 Pa. 419, 812 A.2d 617 (2002).

"An appellate court will not disturb the lower court's judgment absent a manifest abuse of discretion. In order to constitute an abuse of discretion, a sentence must either exceed the statutory limits or be so manifestly excessive as to constitute an abuse of discretion. Further, a sentence should not be disturbed where it is evident that the sentencing court was aware of sentencing considerations and weighed the considerations in a meaningful fashion." *Commonwealth v. Fish,* 752 A.2d 921, 923 (Pa. Super. 2000). (citation and internal quotations omitted) A challenge to an alleged excessive sentence is a challenge to the discretionary aspects of sentencing. *Commonwealth v. Ahmad,* 961 A.2d 884, 886 (Pa. Super. 2008). A challenge to the discretionary aspects of the sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute. *Id.* A challenge to discretionary aspects of a sentence must present a substantial question as to the appropriateness of the sentence under the Sentencing Code, 42 Pa.C.S. §9781(b), in order to be reviewed. *Id.* Long-standing precedent provides that

any challenge to the exercise of discretion enjoyed by a trial court in imposing a sentence consecutively or concurrently fails to raise a substantial question. *Commonwealth v. Pass,* 914 A.2d 442, 445 (Pa. Super. 2006).

During the sentencing hearing, guideline ranges were placed on the record as follows. The sentence imposed is in parentheses:

"Count 1, corrupt organizations—Offense gravity score (OGS) 8; Standard range 9-16 months; Aggravated range 25 months; Mitigated range restorative sanctions. (16 to 32 months.)

"Count 2, corrupt organizations—OGS 8; Standard range 9-16 months; Aggravated range 25 months; Mitigated range restorative sanctions. (16 to 32 months.)

"Count 3, conspiracy—OGS 13; Standard range 60-78 months; Aggravated range 90 months; Mitigated range 48 months. (78 months to 156 months.)

"Count 5, possession with intent to deliver (500 grams cocaine)—OGS 11; Mandatory of 48 months; Standard range 36-54 months; Aggravated range 66 months; Mitigated range 24 months. (48 to 96 months.)

"Count 7, possession with intent to deliver (500 grams cocaine)—OGS 11; Mandatory of 84 months; Standard range 36-54 months; Aggravated range 66 months; Mitigated range 24 months. (84 to 168 months.)

"Count 10, criminal use of a communication facility—OGS 5; Standard range 9 months; Aggravated range 12 months; no Mitigated range. (6 to 12 months.)" (N.T. sentencing, 9/26/2006, pp. 4-7.)

After the verdict but prior to sentencing, the court became aware that the defendant's original name is Frank Reyes and he had adopted the name Pablo Urbina-Nevarez because "a person got me those papers." (N.T. 8/28/2006-9/1/2006, p. 231.) This necessitated a delay of sentencing so the defendant could be re-fingerprinted and a search for prior convictions under the name Frank Reyes could be conducted. (N.T. 8/28/2006-9/1/2006, pp. 230, 232.) The additional search did not reveal any prior convictions. (N.T. sentencing 9/26/2006, p. 2.)

The court in this case gave consideration to many factors when sentencing the defendant, including (1) the age of the defendant; (2) nature of the offenses; (3) the guideline ranges as put on the record; (4) the pre-sentence report, after important changes were made because the defendant provided false information about his name, country of origin, citizenship and family; (5) *Commonwealth v. Vasquez,* 562 Pa. 120, 753 A.2d 807 (2000), which ruled that the second count of a two county indictment for drug trafficking is subject to mandatory enhancement based upon the first count as a prior conviction; (6) the size of the drug trafficking enterprise in Berks County; (7) the defendant's lack of remorse for delivery of vast quantities of cocaine; (8) the fact the defendant was a fugitive from justice and only brought to trial by a bail bondsman after trial had begun, which shows contempt for the court; (9) the fact the defendant had an INS detainer; (10) the defendant's role in the drug trafficking organization, which sought to make as much money as possible without regard to our laws, community, citizens and children; (11) the recommendations of the Commonwealth and defense counsel; and (12) that

any lesser sentence would depreciate the seriousness of the crimes. (N.T., sentencing, 9/26/2006, pp. 13-15.)

The defendant now raises three claims of error regarding the sentence imposed by this court.

The defendant's first claim of error is that sentence was excessive due to his lack of a prior record score. However, this issue is without merit because the guidelines, as placed on the record, properly reflected the defendant's lack of a prior record score. No sentence enhancement was imposed for a prior record score because the defendant had none.

Second, the defendant challenges the imposition of consecutive, rather than concurrent sentences. This court's choice of consecutive, rather than concurrent, sentences was within the sound discretion of the trial court. This issue does not raise a substantial question and thus should not be entertained by the Superior Court. See *Pass, supra.*

Finally, the defendant's claim that his sentence was excessive due to consideration of his fugitive status and absence from the beginning of the trial is not supported by existing law. In fact, Pennsylvania courts have relied upon consideration of fugitive status as a valid consideration when the imposition of a sentence above the sentencing guidelines was challenged as lacking adequate reason for departure from the guidelines. See *e.g., Commonwealth v. Lewis,* 911 A.2d 558, 567 (Pa. Super. 2006).

For all the above-mentioned reasons, the court respectfully requests the defendant's appeal be denied.