J-S31015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOSUE FIGUEROA, | |
| Appellant | No. 1591 MDA 2014 |

Appeal from the Judgment of Sentence September 2, 2014
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):
CP-22-CR-0002942-2012
CP-22-CR-0002962-2012

BEFORE:  BENDER, P.J.E., ALLEN, J., and WECHT, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED JUNE 25, 2015**

Appellant, Josue Figueroa, appeals *nunc pro tunc* from the judgment of sentence of life imprisonment, imposed after a jury convicted him of second-degree murder, robbery, criminal conspiracy to commit robbery, and false reports to law enforcement authorities.  On appeal, Appellant raises one claim of ineffective assistance of trial counsel, and argues that the evidence was insufficient to sustain his convictions.  After careful review, we affirm.

Appellant and his co-defendant, Juan Serrano-Torres, were arrested and charged with, *inter alia*, robbery, conspiracy, and criminal homicide after they plotted to rob Francisco Oquendo-Nieves, who was shot and killed by Serrano-Torres during the course of that robbery. Appellant and Serrano-Torres were tried by a jury on August 6 and 7, 2013.  At the conclusion

thereof, Appellant was found guilty of the above-stated offenses.[1] Appellant was sentenced that same day to life imprisonment for his second-degree murder conviction. He also received concurrent terms of five to ten years' incarceration for his robbery conviction, five to ten years' incarceration for his criminal conspiracy conviction, and one to two years' incarceration for his false reports conviction.

Appellant filed a timely notice of appeal. However, Appellant's counsel did not timely file a docketing statement as required by Pa.R.A.P. 3517. Accordingly, on October 31, 2013, this Court issued a *per curiam* order dismissing Appellant's appeal.

Appellant filed a timely *pro se* petition for relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, alleging, *inter alia*, that his appellate counsel was ineffective for allowing his direct appeal to be dismissed. Appellant sought the reinstatement of his direct appeal rights *nunc pro tunc*. The PCRA court appointed counsel, who filed an amended petition on Appellant's behalf. On September 2, 2014, the PCRA court issued an order reinstating Appellant's direct appeal rights. Appellant, who is still represented by his post-conviction counsel, filed a *nunc pro tunc* notice of appeal on September 22, 2014. He then timely complied with the

---

[1] Serrano-Torres was also convicted of second-degree murder, robbery, criminal conspiracy to commit robbery, and carrying firearm without a license.

court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, he raises two issues for our review:

1. Whether trial counsel was ineffective in his representation of [] Appellant?

2. Whether the Commonwealth failed to provide sufficient evidence at trial to establish each element of the crimes?

Appellant's Brief at 5 (unnecessary capitalization omitted).

In Appellant's first issue, he alleges that his trial counsel was ineffective for failing to call witnesses on his behalf. We cannot review Appellant's claim, as this is his direct appeal. In **Commonwealth v. Holmes**, 79 A.3d 562 (Pa. 2013), our Supreme Court reaffirmed its prior holding in **Commonwealth v. Grant**, 813 A.2d 726 (Pa. 2002), that, generally, "claims of ineffective assistance of counsel are to be deferred to PCRA review; trial courts should not entertain claims of ineffectiveness upon post-verdict motions; and such claims should not be reviewed upon direct appeal." **Holmes**, 79 A.3d at 576. We acknowledge that the **Holmes** Court

> created two limited exceptions to **Grant**: first, for "extraordinary circumstances," [**Holmes**, 79 A.3d] at 577, "where the trial court, in the exercise of its discretion, determines that a claim (or claims) of ineffectiveness is both meritorious and apparent from the record so that immediate consideration and relief is warranted," **id.**; and, second, for "good cause," permitting review of "multiple, and indeed comprehensive, ineffectiveness claims if such review is accompanied by a waiver of PCRA rights appropriately tailored ...," **id.** at 578.

**Commonwealth v. Turner**, 80 A.3d 754, 763 n.7 (Pa. 2013).

Here, Appellant did not raise his claim of trial counsel's ineffectiveness until he filed his Rule 1925(b) statement; therefore, the trial court did not have the opportunity to determine if his assertion "is both meritorious and apparent from the record so that immediate consideration and relief is warranted...." *Holmes*, 79 A.3d at 577. Additionally, there is no indication in the record that Appellant waived his PCRA rights. Accordingly, Appellant must wait to raise his claim of trial counsel's ineffectiveness until PCRA review.

In Appellant's second issue, he argues that the Commonwealth did not present sufficient evidence to sustain his convictions.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Caban*, 60 A.3d 120, 132-133 (Pa. Super 2012) (quoting *Commonwealth v. Quel*, 27 A.3d 1033, 1037-1038 (Pa. Super.

- 4 -

2011)).

In the present case, we begin by noting that in Appellant's statement of the issue, he claims to be challenging the sufficiency of the evidence to sustain *all* of his convictions. However, his discussion involves only the adequacy of the evidence to support his conviction of second-degree murder. Specifically, Appellant contends that "no witness identified [him] as the shooter/killer[,]" and "there was no evidence or testimony provided at trial that proved [] Appellant knew or conspired with his co-defendant to commit the crime of homicide." Appellant's Brief at 13. While Appellant acknowledges that he "admitted that he knew that [there] was going to be a robbery," he argues that his conviction for second-degree murder cannot stand because he "never indicated that he knew that his co-defendant was going to kill the victim." *Id.* at 14.

Appellant disregards the "basic principle of conspirator liability, that once there is evidence of the presence of a conspiracy, the conspirators are liable for the acts of co-conspirators committed in furtherance of the conspiracy." *Commonwealth v. Stocker*, 622 A.2d 333, 342 (Pa. Super. 1993) (citing *Commonwealth v. Thomas*, 189 A.2d 255, 258 (Pa. 1963)). Here, the trial court provides a detailed summation of the evidence presented at Appellant's trial, which Appellant does not dispute. *See* Trial Court Opinion, 12/1/14, at 2-19. We need not reproduce the court's factual recitation herein. Instead, we rely on that portion of the trial court's opinion

to conclude that the Commonwealth's evidence was more than sufficient to prove that Appellant conspired with Serrano-Torres to rob the victim. Because both Appellant and Serrano-Torres admitted that Serrano-Torres shot and killed the victim in furtherance of that conspiracy, Appellant is liable for the murder of the victim. Accordingly, Appellant's conviction for second-degree murder is supported by sufficient evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/25/2015

THE COMMONWEALTH OF . PENNSYLVANIA

v.

JOSUE FIGUEROA

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
:
: TRIAL NO.: 2962 CR 2012; 2942 CR 2012
: SUPERIOR NO.: 1591 MDA 2014
:
:
: CRIMINAL MATTER
:

## TRIAL COURT MEMORANDUM OPINION PURSUANT TO PENNSYLVANIA RULE OF APPELLATE PROCEDURE 1925(a)

Presently before the Superior Court of Pennsylvania is the direct appeal of Josue

Figueroa (hereinafter "Appellant").

## Procedural History

At docket 2962 CR 2012, Appellant was charged with Criminal Homicide, Robbery,

Conspiracy and Firearms Not to be Carried Without a License.

At docket 2942 CR 2012, Appellant was charged with False Reports.

From August 6, 2013, through August 7, 2013, a jury trial was held. On August 7, 2013,

Appellant was found guilty of all charges except for Firearms Not to be Carried Without a

License which was withdrawn. He was immediately sentenced as follows:

At docket 2962 CR 2012:

> Count 1 – Criminal Homicide/ Second Degree Murder - Life in a state
> correctional institution, a fifty dollars ($50) fine plus court costs;
> Count 2 – Robbery - Five (5) to ten (10) years in a state correctional
> institution, fifty dollars ($50) fine plus court costs, to run
> concurrent to Count 1; and
> Count 3 – Criminal Conspiracy - Five (5) to ten (10) years in a state
> correctional institution, fifty dollars ($50) fine plus court costs, to
> run concurrent with Count 2.

1

At docket 2942 CR 2012:

> Count 1 – <u>False Reports</u> - One (1) to two (2) years in a state correctional institution, a fifty dollars ($50) fine, plus court costs to run concurrent to Count 1 at docket 2962 CR 2012.

Appellant was granted time credit from April 13, 2012, to August 7, 2013. Further, Bryan M. McQuillan, Esq., Appellant's trial counsel, was appointed to continue representation on appeal.

Appellant filed a Notice of Appeal with the Superior Court of Pennsylvania on September 9, 2013. This Court directed Appellant to file of record a concise statement of errors to be complained of on appeal. Appellant did not comply and thus his original appeal was waived.

On July 8, 2014, Appellant filed a PCRA and Attorney Jennifer Tobias Esq., was appointed his PCRA counsel. The PCRA was granted and his appellate rights were reinstated *nunc pro tunc* on September 2, 2014. He was then directed to file of record a concise statement of errors to be complained of on appeal. Appellant timely complied with that order on October 15, 2014; however, counsel indicated that she had not had time to fully review the trial transcript so she was granted an additional thirty days from October 27, 2014, to file an amended statement of matters.

## Factual Background

### Testimony Jodeci Saunders:

On April 12, 2012, Jodeci Saunders (hereinafter "Ms. Saunders") was living in an apartment located at 1312 Derry Street, Harrisburg, with her daughter. (N.T. 18-19). At approximately 7:00 p.m., she left her apartment with her daughter, walked out the back door into a courtyard, through a gate, and entered the parking area. (N.T. 20-22, 24, 28, 35). In the courtyard area, she saw two light skinned Hispanic males smoking; one man was sitting at a

2

picnic table and the other was standing near the gate. (N.T. 26-27, 29, 35). She took note to their presence because it is not common to see people in that area. (N.T. 28, 35, 46). The man near the gate followed her out to the other side of the gate. (N.T. 30). Upon reaching her vehicle in the parking area, she put her child in her car seat and then went to the trunk to get out a diaper. (N.T. 29). She changed her daughter's diaper in the backseat and then crawled to the front of the car. (N.T. 29-30). Ms. Saunders was acting cautiously because the man who followed her out of the gate was now on a cell phone pacing back and forth behind her vehicle. (N.T. 30-33).

While in the front seat, she looked to see why the man followed her out to the parking area. (N.T. 30-32). At that point, Ms. Saunders saw another car pull up. (N.T. 32-33). There were two people inside the vehicle; a male and a female. (N.T. 39, 44, 66-67, 73). The female stayed in the car. (N.T. 39). Meanwhile, the man from the vehicle, a heavier Hispanic, met with the man who followed her outside the gate. (N.T. 36-38). They were talking and exchanged something. (N.T. 36, 38). Ms. Saunders believed it was a drug deal because that area is known for such activity. (N.T. 36, 38). Meanwhile, she noticed the gate opened, the man that was sitting at the picnic table came out of the gate, and then he ducked. (N.T. 40). He began creeping around the vehicles in the parking area. (N.T. 41). The man interacting directly with the man from the vehicle said something as the man from the vehicle was walking away. (N.T. 39-42). He reacted and looked back. (N.T. 39-42). Once he looked back, he got shot. (N.T. 43, 45, 67-68). The shot came from where the man creeping around was located. (N.T. 43). However, she did not see anyone with a gun. (N.T. 76).

After the victim was shot, the man involved in the hand-to-hand interaction with the victim began searching the victim's pockets and taking materials out. (N.T. 44-45). Ms. Saunders began exiting the parking area. (N.T. 46-47, 73-76). She stopped in the middle of the

3

street and looked back to see if the victim got up, but he did not move. (N.T. 49, 53). However, she saw the man that was creeping around the vehicles was walking towards the body. (N.T. 49, 753, 5). Ms. Saunders called the police. (N.T. 49, 75). Ms. Saunders identified the Defendants in court as the two men she saw in the courtyard area that day. (N.T. 51).

**Testimony of Veronica Ortiz:**

In April of 2012, Veronica Ortiz (hereinafter "Ms. Ortiz") was living at 119 South 14th Street with Renee Velazquez (hereinafter "Mr. Velazquez"), her fiancé, Appellant, a.k.a. "Minor." (N.T. 77-79, 85). In the early afternoon of April 12, 2012, she saw Appellant in possession of a handgun. (N.T. 85-86). He was putting the gun in his pants. (N.T. 87-88).

Later that day, she was home when Appellant and his friend that she did not know came over. (N.T. 79-80-81, 98). Ms. Ortiz was in the kitchen washing dishes while the two men were speaking in the living room. (N.T. 81-82). The men were talking in Spanish about committing a robbery because they needed money, but they did not mention a particular victim or particular plans. (N.T. 82-83). Appellant first mentioned the idea of a robbery. (N.T. 83). A few days earlier, Ms. Ortiz's fiancé took a picture of himself with a handgun in her apartment. (N.T. 89). Appellant was the photographer that day. (N.T. 90). The handgun that she saw Appellant in possession of looked similar to the one in the picture. (N.T. 91). After about twenty minutes, the men left the residence together. (N.T. 86, 97). She was under the influence of heroin at the time. (N.T. 96-99). Appellant came back to the house around 8:00 p.m. (N.T. 86, 97). He was acting nervous and claimed to be the victim of a robbery. (N.T. 87). He was wearing different clothes then when she saw him earlier that day. (N.T. 87-88).

Ms. Ortiz identified a picture of Mr. Velasquez holding a gun while in the entrance of her bedroom. (N.T. 89-90). The picture was taken about three days before she saw Appellant with

4

the gun. (N.T. 89). Appellant took the picture and then texted the image to her phone. (N.T. 90). The gun in the picture and the gun she saw Appellant in possession of looked similar. (N.T. 91).

On April 17, 2012, she identified Appellant as one of the individuals she overheard planning the robbery. (N.T. 89, 91-92). On April 18, 2012, she identified Mr. Serrano-Torres as the person who was planning the robbery with Appellant. (N.T. 93-95).

**Testimony of Wanda Baez-Lugo:**

In April of 2012, Wanda Baez-Lugo (hereinafter "Ms. Baez-Lugo") lived at 1240 Market Street with her two children. (N.T. 101-102, 111). She was friends with Juan Serrano-Torres (hereinafter "Mr. Serrano-Torres"), the co-defendant. (N.T. 102, 113). One morning in April of 2012, Mr. Serrano-Torres called requesting a ride to the airport. (N.T. 114). He told her he was going to Puerto Rico for a few days, but did not explain why. (N.T. 104-109). She drove him to the airport, but he could not get a ticket. (N.T. 114). As a result, they went back to her residence. (N.T. 114). While there, he told her that he had killed someone. (N.T. 114). Specifically, he revealed that he robbed someone, taken money, and shot him once. (N.T. 103, 105-109, 112, 114, 118, 125-126). He seemed normal and calm while discussing these events. (N.T. 103, 105-109, 112, 114, 118, 125-126). She did not believe him because she thought he was harmless. (N.T. 114). He requested to sleep at her house that night. (N.T. 102-103, 111, 113). From the time they arrived back at her residence from the airport until April 19, 2012, he did not leave the house. (N.T. 111, 114).

On April 19, 2012, the police arrived looking for Mr. Serrano-Torres. (N.T. 104, 115-116). She informed he was inside and provided police with consent to enter the house. (N.T. 104). At that point, the police retrieved Mr. Serrano-Torres from the home. (N.T. 105).

5

Testimony of Jacqueline Arroyo:

Jacqueline Arroyo (hereinafter "Ms. Arroyo") was friends with Mr. Serrano-Torres. (N.T. 127-128, 140). Mr. Serrano-Torres referred to Ms. Arroyo as his wife, but they were not actually married. (N.T. 141). By April of 2012, Mr. Serrano-Torres had been living with Ms. Arroyo at 218 Crescent Street in Harrisburg for two to three months. (N.T. 128-129, 133, 140-141). On April 12, 2012, she saw him on the corner of 13th and Derry Streets with another man she knew by the nickname "Minor." (N.T. 128-130). She picked them up and drove them to PriceRite to buy food around 11:00 p.m. (N.T. 130-132). Afterwards, she took Minor to a residence located around 13th and Derry Streets. (N.T. 132-133). Mr. Serrano-Torres went back to her residence. (N.T. 133). Mr. Serrano-Torres left her home later that day around 3:30 p.m. (N.T. 133-134, 142). He told her he was going to take some English classes required by parole. (N.T. 142). She did not see him again until 10:00 to 10:30 p.m. that night after she came home from church. (N.T. 133-135, 141-142). Normally, Mr. Serrano-Torres attends church with her. (N.T. 142). At that time, she noticed he was wearing different clothes and the clothes he had on earlier in the day were on the floor. (N.T. 134-135, 142-143). She believes he had come home while she was at church and changed his clothes. (N.T. 143). He was acting nervous. (N.T. 135). He told her that whatever happens he loves her. (N.T. 136, 143-144).

Eventually, she heard about the events of April 12, 2012, through other people. (N.T. 136, 144-145). She confronted Mr. Serrano-Torres and he explained that they were trying to rob a guy and because he ran, he shot him. (N.T. 136-138, 142-144). Furthermore, Mr. Serrano-Torres told her they took five bundles of heroin and about $500 from the victim. (N.T. 138-139). The victim was his ex-girlfriends' new boyfriend. (N.T. 145). Ms. Arroyo asked him to leave her house. (N.T. 138).

6

On April 19, 2012, the police came to her house looking for Mr. Serrano-Torres. (N.T. 139). They took the clothes he left on the floor for evidence. (N.T. 143). She identified Mr. Serrano-Torres as the individual who admitted to the robbery and shooting. (N.T. 140).

**Testimony of Elizabeth Lopez:**

In April of 2012, Elizabeth Lopez (hereinafter "Ms. Lopez") was residing at 1446 Market Street, Harrisburg. (N.T. 146). She considered Mr. Serrano-Torres an acquaintance and owed him money. (N.T. 146, 151). Shortly after April 12, 2012, he contacted her requesting money to buy a ticket to Puerto Rico because his mother was very ill. (N.T. 146-147). She did not give him money. (N.T. 147). Again on Tuesday, April 17, 2012, he came to her house to ask her for money to buy a ticket. (N.T. 147-148, 152). He was in a hurry and acting desperate and nervous. (N.T. 149, 153). Mr. Serrano-Torres revealed to Ms. Lopez he killed someone in the midst of robbing the person. (N.T. 148-150, 152). Mr. Serrano-Torres was not at her house for more than an hour and she gave him $200. (N.T. 152-153).

**Testimony of Detective Joseph A. Zimmerman:**

Joseph A. Zimmerman (hereinafter "Detective Zimmerman") has been employed by the Harrisburg police department as a detective for sixteen years, but has worked for the police department for a total of twenty-one years. (N.T. 154). On April 12, 2012, he was assigned a shooting as the lead investigator. (N.T. 154-155, 189-190). When he arrived at the 1300 block of Thompson Street in Harrisburg, there was a crime scene already established. (N.T. 155, 190). However, the victim had already been transported to the hospital. (N.T. 155, 161, 190). As far as evidence, he saw a hat laying at the scene and marks that appeared to be made with blood as if someone was dragged. (N.T. 159-161). Detective Zimmerman found a shell casing from a gun

7

that was collected by forensics. (N.T. 159-160). Additionally, forensics found cigarette butts by a gate area. (N.T. 161).

Thereafter, Detective Zimmerman proceeded to the hospital. (N.T. 161). The victim, Francisco Oquendo-Nieves (hereinafter "Mr. Oquendo-Nieves and/or victim"), was deceased by the time Detective Zimmerman arrived. (N.T. 162). Detective Zimmerman observed Mr. Oquendo-Nieves laying face up with an injury/ bullet wound on his chest. (N.T. 162). While at the hospital, Detective Zimmerman made contact with Keyla Soto (hereinafter "Ms. Soto"), the victim's girlfriend. (N.T. 164, 192, 196-198). Based on the information provided by Ms. Soto, Appellant became a potential witness. (N.T. 164). Thus, Detective Rivera called Appellant and requested he come to the police station. (N.T. 164, 195).

On April 13, 2012, Detective Zimmerman was present when Appellant voluntarily appeared at the Harrisburg police station in response to Detective Rivera's calls. (N.T. 165, 169-171). Upon arrival, Appellant was escorted up to CID conference room to be interviewed. (N.T. 165-166). Appellant appeared cooperative. (N.T. 166-167). Appellant spoke English, but he was more comfortable speaking Spanish. (N.T. 167). Appellant agreed to take police to the shooter. (N.T. 167-168). As a result, the police had their first suspect: Carlos Mendez (hereinafter "Mr. Mendez"). (N.T. 168, 170). The police conducted an investigation regarding Mr. Mendez's possible involvement and eventually he was cleared of any wrongdoing. (N.T. 168-169, 171).

On the morning of April 19, 2012, Detective Zimmerman was present when the police went looking for Mr. Serrano-Torres at Ms. Arroyo's residence. (N.T. 172, 193-194, 199). Based on information discovered there, the police proceed to the residence Ms. Baez-Lugo

8

where Mr. Serrano-Torres was apprehended. (N.T. 172-173, 194, 199). Further, clothing belonging to Mr. Serrano-Torres was obtained from said residence. (N.T. 194).

Later that day, Mr. Serrano-Torres was in the booking area when Detective Zimmerman received a call from Lieutenant Capello informing that Mr. Serrano-Torres and Appellant were screaming back and forth at one another in Spanish. (N.T. 174-175). As a result, Detective Zimmerman and Detective Rivera went down to the booking area. (N.T. 175). Detective Rivera began to take notes. (N.T. 175-176). After some time passed, Detective Rivera revealed to the men that he had been listening to their conversation. (N.T. 176). Later that evening, Detective Zimmerman sat in on a statement provided by Mr. Serrano-Torres. (N.T. 177-178).

Detective Zimmerman secured a warrant to obtain swabs of the inside of Mr. Serrano-Torres and Appellant's mouths for DNA testing. (N.T. 186-187, 196). He had the swabs sealed in an evidence bag and given to the Pennsylvania State Police for testing. (N.T. 187-188).

### Testimony of Wayne Kenneth Ross:

Wayne Kenneth Ross, M.D., (hereinafter "Dr. Ross") is a forensics pathologist for the Dauphin County Coroner's office. (N.T. 204; 206). Specifically, he performs autopsies to determine the actual cause of death. (N.T. 204-205). He has worked as a forensic pathologist for thirty years and has been involved in over ten thousand autopsies. (N.T. 205). Dr. Ross qualified and testified as an expert in this case. (N.T. 206-207).

On April 13, 2012, Dr. Ross performed an autopsy on the body of Mr. Oquendo-Nieves. (N.T. 208-209, 215). He observed a large gunshot wound to Mr. Oquendo-Nieves's left back. (N.T. 209-210). There was no evidence of soot or gunshot residue on the clothing or the body. (N.T. 210) Thus, it was determined to be a distant gunshot wound, meaning the shot was fired three or more feet away from the victim. (N.T. 210). The bullet entered the left mid-back region

9

and proceeded in a back-to-front, left-to-right, and upward direction. (N.T. 210-211, 216-217). There was no exit wound. (N.T. 211). Dr. Ross explained that the bullet created a significant acute angle going upward, which is consistent with the victim possibly running away or moving away from the shooter. (N.T. 212-213, 217). Furthermore, the bullet traveled through numerous vital organs, such as the left kidney, spleen, upward though the esophagus, and then through the heart. (N.T. 213). The victim would have immediately bled through those vital areas. (N.T. 213). A person would have at least ten to fifteen seconds of oxygenated blood in the brain if the heart is cut off in this manner. (N.T. 213-214).

An x-ray revealed a bullet in the victim's upper right chest, which was recovered and turn over to the Harrisburg Bureau of Police. (N.T. 209-211). Finally, there were abrasions to the knees, scrapes on one ankle, and a scrape to his elbow. (N.T. 209). Dr. Ross explained that these are called friction abrasions consistent with someone moving and then falling down on macadam. (N.T. 209, 214-216). Said injuries would also be consistent with being dragged on pavement or concrete. (N.T. 216). Dr. Ross determined that the gunshot wound was the fatal injury that killed the victim. (N.T. 214). Dr. Ross opined within a reasonable degree of medical certainty that the manner of death was a homicide. (N.T. 214-215).

**Detective Karen Lyda:**

Detective Karen Lyda (hereinafter "Detective Lyda") is a forensic investigator for the Harrisburg Bureau of Police forensic section since September of 2003. (N.T. 219-220). Her primary responsibilities are to photograph crimes scenes, collect evidence, and process evidence. (N.T. 220). On April 12, 2012, she was called out to the 1300 block of Derry Street. (N.T. 220). She identified three cigarette butts and a .40 caliber shell casing. (N.T. 221-224, 226-227, 229). Said shell casing was tested for fingerprints, but none were found; which is common on this type

10

of item. (N.T. 250-252). The shell casings and the cigarette butts were forwarded to the Pennsylvania State Police. (N.T. 229, 231-232). In order to get ballistics testing, the police need the gun to compare with the shell casing. (N.T. 230). In this case, the gun was never recovered. (N.T. 230). Near a vehicle in the parking lot, the police found a blood smear on the ground, blood spatter, and a baseball hat. (N.T. 222-227). It was later determined that the baseball hat belonged to the victim. (N.T. 225). The picnic table was not tested for fingerprints. (N.T. 251).

Detective Lyda went to Harrisburg Hospital where she observed a black Honda parked at the emergency room entrance with crime scene tape around it. (N.T. 233). Detective Lyda took photographs of the car. (N.T. 233). She observed a cell phone and wallet on front passenger's seat. (N.T. 233). Furthermore, she found blood on the door and flooring, two unused clear Ziploc baggies with nothing inside them, a pair of large blue denim shorts with blood on them previously worn by the victim, and a cell phone. (N.T. 233-236, 245). Inside the wallet were two Pennsylvania identifications for Mr. Oquendo-Nives and Ms. Soto. (N.T. 234). The car was seized and taken to the Harrisburg Bureau of Police for further processing. (N.T. 236).

Detective Lyda attended the autopsy on April 13, 2012. (N.T. 241). The police collected an expanded projectile from the victim, clothing items, a wristwatch, two packets of heroin, and a skeleton key. (N.T. 241, 244). The heroin and the key were within the flap of his underwear. (N.T. 241, 244). It is common for drug users and/or dealers to hide drugs in various parts of their clothing. (N.T. 242). The two packets tested positive for heroin. (N.T. 243-244).

On April 13, 2012, she conducted a search at 1614 State Street, the residence of Mr. Oquendo-Nives. (N.T. 245). At said location, they found items that would be indicative of drug sales. (N.T. 245-247). Finally, Mr. Serrano-Torres did not possess a valid license to carry a firearm at the time of this incident. (N.T. 252-253).

11

<u>Testimony of Detective Victor Rivera</u>:

Detective Victor Rivera (hereinafter "Detective Rivera") is employed by the Harrisburg City Police in the Internal Affairs Division. (N.T. 254). He began working for the Harrisburg Bureau of Police in 1987. (N.T. 254, 373-374). He was promoted to the Detective Bureau in mid-1990. (N.T. 254-255). As a result, he has been involved in about two hundred homicide investigations; over thirty of which as lead detective. (N.T. 255). In this case, Detective Rivera took a lead role because of his ability to speak fluent Spanish. (N.T. 256, 263-264).

He spoke with Ms. Saunders, who picked out Appellant, a.k.a. "Flaco" and "Minor," as resembling the individual who was talking to the victim at the time of the shooting. (N.T. 256-259). He received Appellant's contact information from Ms. Soto. (N.T. 374-375). Thereafter, Detective Rivera contacted Appellant via phone. (N.T. 257, 259-260). Detective Rivera requested he come to the police station to assist the police with the investigation. (N.T. 260, 375). Appellant expressed concern for retaliation. (N.T. 260-261, 376, 379-380). Eventually, Detective Rivera and Detective Zimmerman met Appellant in the lobby of the police station. (N.T. 261-262). Appellant appeared nervous and concerned, but cooperative. (N.T. 262, 376-377). Further, he did not appear under the influence of anything. (N.T. 262).

Around 9:05 p.m., Detective Rivera sat down with Appellant in the conference room. (N.T. 263). It was immediately apparent that Appellant's Spanish was better than his English, so the conversation immediately turned to Spanish. (N.T. 263-264). Detective Rivera explained that police knew Appellant was standing next to the victim at the time of the homicide. (N.T. 264). As a result, the police hoped Appellant could assist them in identifying the shooter. (N.T. 264-265). Detective Rivera informed Appellant that he was not under arrest and he was free to leave if he so desired. (N.T. 265).

12

Appellant claimed the person who committed the homicide was Bob or Barber. (N.T. 265-266). At the time they met with the victim for a heroin transaction, he was not aware that Bob/Barber was going to shoot or rob him. (N.T. 266, 270-271). Appellant directed the police to 328 South 16th Street as Bob/Barber's residence. (N.T. 267). As the police drove past the address with Appellant, an individual came out onto the porch that Appellant identified as Bob/Barber. (N.T. 267-268, 273). At that point, Detective Rivera detained said individual: Carlos Mendez (hereinafter "Mr. Mendez"). (N.T. 268, 378). Mr. Mendez was transported to base and Appellant again identified him as the person who shot the victim. (N.T. 268-269, 270-273, 378). However, an investigation of Mr. Mendez lead the police to conclude that he could not have been involved in this crime. (N.T. 271, 273, 277, 378-379).

On April 14, 2012, the police obtain consent to search Appellant's cell phone. (N.T. 273-274). On his phone, the police found two pictures: one picture depicted Appellant holding a semi-automatic handgun in his right hand and the second picture was of an individual, at the time not yet identified, also holding the gun. (N.T. 275-277). Furthermore, the police provided Appellant with a map upon which he drew where he was standing, where the victim was standing, and where the shooter was located. (N.T. 280-281). While explaining the map, Appellant stated that while he was dealing with the victim, "Bob" came out from the courtyard area and shot the victim. (N.T. 281-282). Thereafter, Appellant helped to get the body to the vehicle and transported to Harrisburg hospital. (N.T. 282). Upon arrival at the hospital, Appellant exited the vehicle and walked away. (N.T. 282). Furthermore, Appellant admitted he lied about Mr. Mendez. (N.T. 278, 378-379, 380). Suspicions began to arise about Appellant and he is read his Miranda rights. (N.T. 278-279). Appellant indicated he wanted to talk to the police and maintained his cooperation. (N.T. 278-279). Appellant explained the same story of

13

events. (N.T. 279-284). He took the police to 1629 Berryhill Street, where "Bob/Barber" lived. (N.T. 280, 282-285). An individual by the name of Carlos Santiago-Cruz (hereinafter "Mr. Santiago-Cruz") once lived at said address. (N.T. 285). Mr. Santiago-Cruz's photograph is placed into a photo array and Appellant identified him as the shooter. (N.T. 285-286). Later, the police discovered that Mr. Santiago-Cruz was visiting someone at Osteopathic Hospital at the time of the homicide. (N.T. 287-288).

At this point in time, Appellant was charged with false reports. (N.T. 288, 380). The police approached him a third time on April 16, 2012. (N.T. 288). Again, Appellant was read his Miranda rights and he agreed to continue speaking with police. (N.T. 289). Appellant said that the individual who committed the homicide was the person in the picture from his phone holding the gun, but he did not know his name. (N.T. 289-290). Appellant called him "Pedro." (N.T. 290). Furthermore, the handgun in the picture was the same gun used to kill the victim. (N.T. 293-294). He claimed the gun belonged to Pedro. (N.T. 294, 302). Again, Appellant recounted the same storyline. (N.T. 290). Appellant said he did not know Pedro was going to shoot the victim, but admitted they had plans to rob the victim of his heroin which were made at Pedro's house. (N.T. 290-291, 295-301). Appellant identified Pedro in a photo array, provided another address, and gave a third statement. (N.T. 291-293). As a result, the police proceed to 119 South 14th Street. (N.T. 303). Eventually, the police clear "Pedro," whose real name is Mr. Velazquez. (N.T. 304, 380).

On April 18, 2012, the police again meet with Appellant at the Harrisburg Police station. (N.T. 304). Appellant continued to cooperate, was apologetic for the misidentifications, and expressed concern for his safety. (N.T. 305). For the fourth time, Appellant is read his constitutional rights and continues to cooperate. (N.T. 305, 327). At this point, Appellant

14

identified an individual by name as Juan a/k/a Sangrey Torres, referenced occasionally as "Miguel," i.e. Mr. Serrano-Torres. (N.T. 306, 380-381-383). Appellant provided a fourth statement and identifies Mr. Serrano-Torres in a photo array as the man who shot Mr. Oquendo-Nives. (N.T. 306, 309-310, 328, 382-384). He explained that when Mr. Oquendo-Nives arrived he handed over the drugs to Mr. Serrano-Torres. (N.T. 309-320). Appellant and Mr. Serrano-Torres told him they did not have the money, but were going to keep the drugs. (N.T. 309-320). Then, Mr. Oquendo-Nives started running because he saw Mr. Serrano-Torres with the gun. (N.T. 309-320). At that point, a shot was fired. (N.T. 309-320). Afterwards, Mr. Serrano-Torres searched the victim's body and then left the scene. (N.T. 320-321). Appellant helped take Mr. Oquendo-Nives to the hospital. (N.T. 321-322, 375). He threw the clothes he was wearing in the trash. (N.T. 323). Further, the robbery was planned and the .40 millimeter gun depicted in the phone pictures was the gun used in the homicide. (N.T. 324-326). Mr. Serrano-Torres kept all the drugs that were stolen. (N.T. 327). As a result of this fourth statement, Mr. Serrano-Torres became a suspect. (N.T. 327-328).

On April 19, 2012, the police went to Ms. Baez-Lugo's home on Market Street. (N.T. 330-331, 387). Mr. Serrano-Torres was found inside and taken him into custody. (N.T. 331, 386-388). Mr. Serrano-Torres was provided his Miranda rights. (N.T. 331-332). The police showed Ms. Arroyo a photo array and she identified Mr. Serrano-Torres as the person staying in her house who admitted to her that he committed this crime. (N.T. 332). Likewise, the police showed Ms. Baez-Lugo a photo array and asked her to identify the individual who was at her house and who confessed to her that he committed the crime. (N.T. 332-336). Again, Mr. Serrano-Torres' photo was chosen. (N.T. 333-335). Ms. Lopez-Rivera was asked to identify the person who admitted to killing the victim. (N.T. 333). She identified Mr. Serrano-Torres. (N.T.

15

333). Finally, on April 18, 2012, Ms. Ortiz was shown two photo array and asked to identify the person who was in her home discussing the robbery. (N.T. 336-339). Ms. Ortiz circled the photo of Mr. Serrano-Torres. (N.T. 338-339).

That same day, Mr. Serrano-Torres was taken to the holding cells in the police station. (N.T. 391). He was there for a number of hours before Appellant was brought down into a cell as well. (N.T. 392-393). Thereafter, Detective Rivera was instructed to go down to the holding cells. (N.T. 341, 393). Upon arrival, Detective Rivera and Detective Zimmerman overheard Appellant and Mr. Serrano-Torres yelling at one another in Spanish about the homicide. (N.T. 342-347). Detective Rivera was able to recognize their voices. (N.T. 393). Further, he was informed of who was in which holding cells. (N.T. 393). Detective Rivera immediately began taking notes. (N.T. 346, 394). Specifically, Appellant asked Mr. Serrano-Torres if he knew anything about the gun and Mr. Serrano-Torres told him it had not been found. (N.T. 346). They spoke about hiding the gun. (N.T. 347). Appellant assured Mr. Serrano-Torres that he did not tell on him. (N.T. 346-347). They talked about being afraid to be charged with murder and conspiracy. (N.T. 347). They talked about not confessing. (N.T. 347). Appellant told Mr. Serrano-Torres that Mr. Serrano-Torres is being charged because he shot the guy. (N.T. 347). Mr. Serrano-Torres assured Appellant not to worry because he was the one that shot the victim and so he would take responsibility for the homicide. (N.T. 347). Appellant told Mr. Serrano-Torres that he swallowed the drugs they took and puked them out at the prison. (N.T. 347). Appellant asked Mr. Serrano-Torres why he did not go to Puerto Rico to which he responded he did not have the money. (N.T. 348). Finally, they spoke about people telling on them. (N.T. 348). After listening for about forty-five minutes, Detective Rivera decided to let them know that he had been standing outside of their holding cells listening to them talk about the homicide.

16

(N.T. 349, 395-396). Detective Rivera proceeded to leave when Mr. Serrano-Torres requested to speak with him in private. (N.T. 349-350, 396-397).

Detective Rivera took Mr. Serrano-Torres upstairs to the conference room and again read Mr. Serrano-Torres is Miranda rights. (N.T. 350-351, 397). Mr. Serrano-Torres signed a form written in Spanish which outlined his rights and indicated he wanted to speak with police. (N.T. 351, 397). Afterwards, the police took a statement from Mr. Serrano-Torres primarily discussing what had just taken place in the holding cells of the police station. (N.T. 352-353, 354). Again, Mr. Serrano-Torres was asked if he understood his rights and Mr. Serrano-Torres responded he did. (N.T. 353). Then the police played Appellant's recorded statement implicating Mr. Serrano-Torres. (N.T. 352-353, 397-398). When the statement got to the point where Appellant identified Mr. Serrano-Torres as the shooter, Mr. Serrano-Torres stated that he heard enough and was ready to give his own statement. (N.T. 353-354, 398-399). Mr. Serrano-Torres was alert and not under the influence of drugs or alcohol. (N.T. 401-402). At that time, Mr. Serrano-Torres gave a second statement to police. (N.T. 354). The statement began at 7:28 p.m. and ended at 8:10 p.m. (N.T. 354). Again, Mr. Serrano-Torres is informed of his rights and indicated he wanted to speak. (N.T. 355). During the statement, Detective Rivera asks Mr. Serrano-Torres to explain what happened the night of the April 12, 2012. (N.T. 355). Mr. Serrano-Torres responded:

> Well, that day, the other guy had someone that he would buy from, you understand, whatever he said, the drugs that he said. And then he stayed talkin' to me so that the drugs can be taken, you understand, and that he had on him. So me and my dumbness and ignorance, I said, yes, let's do it. It doesn't relate to this, but I didn't have any money. It doesn't relate, but I needed it. And then he -- I -- then he called him. We planned everything that we were going to do before we did it and kept that goin' to meet with the guy, the person that died, or better said, the one that I killed. Then -- then they met there. And when they met there, the guy was doin' the negotiating with him. I was hiding in place where he could not see me. But the supposed friend of mine, the other guy, knew where I was, right?

17

I guess the negotiating did not take place correctly, but he took everything. He had taken that. You understand me? Then supposedly he was short some money in order to square off with the guy because he didn't have all the money in total. Then that is when – then that is when let's told him let's go there, understand? Let's talk there, that maybe I lost the money. And then when they go over there, that he started walkin', the guy asked him, who is that? And he saw me, and he said that he didn't know. But when they entered, I pointed with the gun. And then the guy got scared. And I told him, don't run, and he started runnin'. He stopped. I told him, don't run. And he started runnin' again. And that's when I went "pan pan". We went up to him, took his money. I left one way and he left the other, understand? I left to my house. I didn't run. I walked, and I in any moment ran. I went walking. I went to my house. I changed clothing, and much later he got there. We split the money, you understand? He went his way, and I went mine. You understand? That's the way it happened.

(N.T. 356-358, 365-366). Mr. Serrano-Torres further stated, "I am conscious that I did a bad thing, and I accept the reality of life." (N.T. 359). Mr. Serrano-Torres said their plan was not to kill, but rather just to rob the victim. (N.T. 359-361, 365). Mr. Serrano-Torres stated that the gun used in this crime belonged to Appellant. (N.T. 361, 385). Mr. Serrano-Torres did not know the victim, but admitted he had a previous romance with Ms. Soto, the victim's girlfriend. (N.T. 361-364). After the homicide, Appellant and Mr. Serrano-Torres divided everything Appellant took; Mr. Serrano-Torres received two bundles of heroin and $200. (N.T. 367-369). Detective Rivera identified Mr. Serrano-Torres in Court as the person who provided the above summarized statement. (N.T. 369).

**Testimony of Hai Sheng Li:**

Hai Sheng Li (hereinafter "Dr. Li") works for the Pennsylvania State Police DNA Division as a forensic DNA scientist. (N.T. 404). Dr. Li was qualified as an expert witness in the field of DNA profiling. (N.T. 404-407). Dr. Li explained that a DNA sequence is different from person to person and can be found in every cell of the human body. (N.T. 407-408). Saliva from a mouth and the epithelial cells, which are the living cells in the mouth, would contain DNA if left on a piece of evidence. (N.T. 408). It is also possible to perform DNA testing on a

18

dried bodily fluid stain, such as saliva or blood. (N.T. 409). Further, safeguards are in place to make sure everything is done properly at the testing lab, such as sealing and labeling the evidence. (N.T. 409-413). Dr. Li received buccal swabs collected from Mr. Serrano-Torres and Appellant. (N.T. 413-414). Further, Dr. Li received three cigarette butts from the crime scene. (N.T. 414). The first cigarette contained DNA from Mr. Serrano-Torres and Appellant. (N.T. 414-415). Dr. Li explained that no other person could have left DNA on this piece of evidence except Mr. Serrano-Torres and Appellant. (N.T. 415-416). Regarding a second cigarette butt, Dr. Li was able to obtain a single DNA profile matching that of Mr. Serrano-Torres's DNA. (N.T. 417). In regards to a third cigarette butt, it did not match any of the DNA profiles obtained from the buccal swabs. (N.T. 418-419). There was no determination made as to how long the DNA had been on these objects. (N.T. 419).

## Concise Statement of Matters Complained Of On Appeal

- Trial counsel was ineffective in his representation in that he did not introduce witnesses on his behalf or properly cross-examine the witnesses during trial.

- The Commonwealth failed to provide sufficient evidence at trial to support the guilty verdict.

## Legal Discussion

Since there is a presumption that counsel provided effective representation, the defendant bears the burden of proving ineffectiveness. Commw. v. Ligons, 971 A.2d 1125, 1137 (Pa. 2009) (*citation omitted*). To prevail on a claim that counsel was constitutionally ineffective, the appellant must overcome the presumption of competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different. Commw. v. Pierce, 515 Pa. 153, 158, 527 A.2d 973, 975 (1987).

19

Under any ineffective claim, counsel can be found ineffective if counsel failed to file a direct appeal as requested by the defendant. Commw. v. Lantzy, 736 A.2d 564, 571 (Pa. 1999).

First, Appellant's direct appeals rights were reinstated *nunc pro tunc* in response to his Post Conviction Relief Act petition claiming ineffective assistance of counsel for failing to file a direct appeal. Any claim regarding ineffective assistance of counsel for failure to file a direct appeal has been remedied by reinstating his direct appeal rights.

Next, Appellant contends that trial counsel did not properly represent him, introduce witnesses on his behalf or properly cross-examine the witnesses during trial. It is evident from the record that counsel did cross-examine witnesses during the trial. The major witness against Appellant, Detective Rivera, was thoroughly cross examined as to Appellant's initial statements, his willingness to cooperate, the high drug and high crime nature of the area where the crime occurred. He also reveals under cross that Appellant was nervous about cooperating as he was afraid of the shooter. All of this information was helpful in attempting to mitigate Appellant's involvement.

As to presenting witnesses, Appellant does not indicate that there were any witnesses who would be of use to him during the trial. Further, he chose not to testify himself, as is his right. There is no indication anywhere in the record that there are any witnesses who might exonerate Appellant. It appears form the record that counsel did properly represent Appellant at trial.

A claim challenging the sufficiency of the evidence is a question of law. Commw. v. Snyder, 870 A.2d 336, 346 (Pa. Super. 2005). When considering a challenge to the sufficiency of the evidence, it is necessary to determine whether the evidence admitted at trial and all reasonable inferences therefrom, when viewed in the light most favorable to the Commonwealth

20

as the verdict winner, is sufficient to establish every element of the offense beyond a reasonable doubt. Commw. v. Kirkland, 831 A.2d 607, 610 (Pa. Super. 2003).

When reviewing the sufficiency of the evidence, the reviewing court may not substitute its judgment for that of the fact-finder; if the record contains support for the conviction it may not be disturbed. Commw. v. Parker, 847 A.2d 745 (Pa. Super. 2004). Moreover, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. Commw. v. Bullick, 830 A.2d 998, 1000 (Pa. Super. 2003). The facts and circumstances established by the Commonwealth at trial need not preclude every possibility of innocence. Commw. v. Kerry, 906 A.2d 1237, 1240 (Pa. Super. 2006). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt via wholly circumstantial evidence. Id.

Since the jury convicted Appellant of all charges, it may be presumed the jury found the witnesses' testimony credible.

Appellant was found guilty of criminal homicide. A person commits the offense of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being. 18 Pa. C.S.A. § 2501. "A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal *or an accomplice* in the perpetration of a felony." 18 Pa.C.S.A. § 2502(b)(emphasis added). The "perpetration of a felony" is defined as: "The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S.A. § 2502(d).

21

There was substantial testimony that Appellant and Mr. Serrano-Torres were robbing the victim at the time he was killed. In fact, both Appellant and Mr. Serrano-Torres admitted that robbing the victim was the original plan. Contrary to Appellant's belief, Appellant and Mr. Serrano-Torres did not need to intend to kill the victim, the fact is, the victim was killed during the perpetration of a felony – that is during the robbery. As an accomplice in the robbery, Appellant is liable for the murder of the victim.

Appellant was found guilty of robbery. A person is guilty of robbery if, in the course of committing a theft, he: (i) inflicts serious bodily injury upon another; or (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury. 18 Pa. C.S.A. §3701(a)(1)(i)&(ii).

Again, there was substantial testimony; including confessions that Appellant and Mr. Serrano-Torres inflicted serious bodily injury (shot) the victim while committing a theft. They took money and drugs from him.

Appellant was found guilty of criminal conspiracy. A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime and (e) Overt act.--No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired. 18 Pa. C.S.A. § 903(a),(e).

22

In this case, both men admitted to planning to commit the crime of robbery. They planned to rob the victim of his drugs. Further, they called the victim, set up the "buy" and then in fact took the drugs without paying. They then threatened the victim with the gun and ultimately shot him.

Here, there is nothing within the evidence and the findings of the jury that "shock one's sense of justice." The jury was presented with a credibility decision to make in this case. The record consists of sufficient testimony by each witness to convict Appellant of the crimes charged. The jury was able to assess the credibility of these witnesses and to make a determination as to whether or not they were telling the truth. In this case, the jury decided to believe the testimony of the witnesses, decided it was enough to prove each and every element of the offense beyond a reasonable doubt, and convict Appellant.

Accordingly, we request that Appellant's appeal in this matter be dismissed and that the Jury's verdict and this Court's subsequent sentencing be affirmed.

Respectfully submitted:

_____
Deborah E. Curcillo, Judge

Dated: _12 - 1 - 14_

23

_Distribution:_ 12-2-14 @ 2PM
Hon. Deborah E. Curcillo
Dauphin County Clerk of Courts
Joe Cardinale, Esq., Dauphin County District Attorney's Office 1/0
XJennifer Tobias, Esq., PO Box 365 Stewartstown, PA 17363 Mail
The Superior Court of Pennsylvania Mail

24

COMMONWEALTH OF PENNSYLVANIA

VS.

JOSUE FIGUEROA

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA FOR THE
: MIDDLE DISTRICT
:
: NO.: 1591MDA 2014

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief for Appellant

was served upon the following in the manner indicated below:

### HAND DELIVERY:

Superior Court of Pennsylvania
Middle District
Pennsylvania Judicial Center
601 Commonwealth Avenue, Suite 1600
Harrisburg, PA 17106-2435

Edward M. Marsico, Esquire
Dauphin County District Attorney
Dauphin County Courthouse
Front and Market Streets
Harrisburg, PA 17101

### FIRST CLASS - U.S. MAIL

Josue Figueroa
LD-6709
SCI Greene
175 Progress Drive
Waynesburg, PA 15370

HAND DELIVERED

Received In Superior Court

JAN 2 8 2015

MIDDLE

By: _____
Jennifer E. Tobias, Esquire
Attorney ID# 82816
P.O. Box 365
Stewartstown, PA 17363
(717) 650-8457

Dated: January 28, 2015